*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 03-1925

ROBERT LEE HARMON, also known as RASHAD
HARMON, also known as BOBBY HARMON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 02-90012—Marianne O. Battani, District Judge.

Argued: December 7, 2004

Decided and Filed: May 12, 2005

Before: NELSON and BATCHELDER, Circuit Judges; COLLIER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jonathan Epstein, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Jonathan Epstein, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

DAVID A. NELSON, Circuit Judge. The defendant in this sentencing guidelines case admitted to having defrauded investors of more than $640,000. Indicted for wire fraud (18 U.S.C. § 1343), engaging in monetary transactions in criminally derived property (18 U.S.C. § 1957), and transporting stolen monies (18 U.S.C. § 2314), he pleaded guilty to one of the indictment's two § 1957 "monetary transaction" counts. The remaining counts were dismissed.

---

[*]The Honorable Curtis Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

The count to which the defendant pleaded guilty charged him with having violated § 1957 by engaging in a $39,000 transaction in criminally derived property. The other § 1957 count charged him with engaging in a $50,000 transaction, for a total of $89,000 in monetary transactions involving criminally derived property.

Under the version of U.S.S.G. § 2S1.2 (the § 1957 "monetary transaction" guideline) that was in effect at the time of the crime, the defendant's guideline offense level depended on "the value of the funds" involved. The prosecutor urged the district court to use that version of § 2S1.2 rather than the version in effect at the time of sentencing. The prosecutor further took the position that the value of the funds relevant in determining the sentence for the § 1957 violation should be measured by the portion of criminally derived property that the defendant was charged with having transferred in violation of § 1957. Under the prosecutor's approach, the defendant's guideline sentence range was imprisonment for 24-30 months. If "the value of the funds" was the full amount of which the investors had been defrauded, on the other hand, the range was higher. The defendant, not surprisingly, agreed with the prosecutor that the correct range was 24-30 months.

The district court concluded that the prosecutor and the defendant had it wrong. Under both editions of the Guidelines Manual, the "Relevant Conduct" guideline (U.S.S.G. § 1B1.3) said that under certain conditions a defendant's "specific offense characteristics" should be determined on the basis of all of the defendant's acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Applying that section, the district court held that the guideline range was 37-46 months. The defendant was sentenced to a term of 37 months, and he has appealed his sentence.

We conclude that the approach followed by the district court, using the edition of the manual in effect at the time of sentencing, should have yielded a sentence range of either 24-30 months or 30-37 months. If the latter, we agree with the prosecutor and the defendant that the court was required to use the earlier edition of the manual. Under the earlier edition, as we read it, the guideline for § 1957 violations required that the defendant's offense level be determined by reference to the $89,000 which the defendant was accused of having transferred in violation of § 1957. The correct guideline range, in our view, was thus 24-30 months. For that reason, and because we now know that the sentence was tainted by plain error under *Booker v. United States*, 125 S.Ct. 738 (2005), the case will be remanded for resentencing.

Although the guidelines are no longer to be treated as mandatory, see *Booker,* 125 S.Ct. at 764-65, they must still be given consideration by the sentencing court. This means that when the defendant is resentenced, the district court should take into consideration the fact that the guidelines would suggest a sentence of not less than 24 months and not more than 30 months. The court should also give appropriate consideration to the statutory factors that have always been relevant under the Sentencing Reform Act of 1984, see 18 U.S.C. § 3553(a), and the court should impose a sentence that is reasonable under the circumstances. We intimate no opinion as to whether a sentence equal to that imposed originally would be reasonable.

I

The defendant, Robert Lee Harmon, ran a company called Harmony Entertainment. Harmony's ostensible business consisted of promoting concerts and tours by popular musicians.

Although Harmony staged a few small (and apparently unprofitable) concerts, it took in substantial sums of money from investors who were promised large returns from performances by well known artists whom Harmony did not, in fact, represent. In July of 2000, for example, an investor was persuaded to wire $300,000 from Australia to Harmony's Merrill Lynch account in Michigan on the strength of representations that the funds would be used to promote a concert tour

by Britney Spears, a prominent singer. The funds were not in fact used for that purpose, Harmony evidently having had no connection whatever with Britney Spears.

An indictment handed up by a federal grand jury in May of 2002 charged Mr. Harmon and two associates with 29 counts of wire fraud and aiding and abetting wire fraud; two counts of engaging in, and aiding and abetting one another in, monetary transactions in criminally derived property; and one count (limited to Mr. Harmon and one of the other defendants) of transporting in interstate commerce money known to have been obtained by fraud.

As to the "monetary transaction" offenses, Count 30 of the indictment, after realleging and incorporating by reference the indictment's "General Allegations" regarding the scheme to defraud, alleged that on or about July 12, 2000, the defendants

> "caused funds in the amount of $39,000 to be transferred from the account of Harmony Entertainment with Merrill Lynch and deposited into the Sun Trust Bank in Alexandria Virginia, a financial institution which was engaged in, and the activities of which[] affected interstate commerce, which money the defendants knew to be criminally derived property and which constituted and was derived from the proceeds obtained from the commission of wire fraud in violation of 18 U.S.C. § 1343; all in violation of 18 U.S.C. §§ 2, 1343 and 1957."

Count 31 contained similar allegations with respect to a $50,000 transfer from Harmony's Merrill Lynch account to the account of Judy White Evans (the wife of one of Mr. Harmon's co-defendants) at Comerica Bank in Detroit.

The case was scheduled to go to trial on Monday, January 27, 2003. On the morning of the appointed day the district court was advised that Mr. Harmon wished to plead guilty to Count 30 of the indictment. The Assistant United States Attorney in charge of the prosecution explained that he had been approached the preceding Friday afternoon about a potential plea; that although there was no Rule 11 plea agreement, the parties had "formalized" an unwritten agreement with respect to Count 30 earlier that morning; and that if Mr. Harmon, on pleading guilty to Count 30, were to receive a two-level reduction in his offense level for acceptance of responsibility, the guideline sentence range, as the prosecutor calculated it, would be imprisonment for a term of 24 to 30 months.

Before the court accepted the plea, Mr. Harmon was advised of the rights he would be giving up if he pleaded guilty. The court told him that if he received the two-level reduction for acceptance of responsibility, "[i]t appears that you're going to get somewhere around . . . 24 to 30 months." The court indicated, however, that it would follow the guidelines wherever they led and added that "[t]here's no promise to you that 24 months or 30 months is going to be your maximum." The court went on to make it "absolutely clear . . . [that] there is no agreement here. We're not talking about any kind of agreements except for the Court to follow the guidelines, however that comes out." Mr. Harmon acknowledged that he understood this.

Called upon to outline "what we are talking about" with respect to Count 30, the prosecutor explained that Mr. Harmon's company, Harmony Entertainment, had represented to an investor named Dr. Sam Chachoua that the company was in a position to promote a series of Britney Spears concerts; that acting on the representations made to him, Dr. Chachoua had wired $300,000 from out of the country to Harmony's account at the Merrill Lynch office in Bloomfield Hills, Michigan; that from the $300,000, Mr. Harmon had caused the transfer of $39,000 to his wife's account at a bank in Richmond, Virginia; and that Harmon had then applied the $39,000 to the purchase of a Range Rover vehicle.

Mr. Harmon acknowledged in open court that he wished to plead guilty to this charge. Testifying under oath, he further stated that he had knowingly wired to his wife's account $39,000 in funds he had fraudulently obtained from Dr. Chachoua; that although he knew Dr. Chachoua had wired $300,000 to the Harmony account in reliance on representations that Harmony had contracts to promote a series of Britney Spears concerts, Harmony had no contract for a Britney Spears appearance; and that with the $39,000 he took from Dr. Chachoua's $300,000, he purchased a used 1997 Range Rover. The court accepted the plea and entered a judgment of guilty. Sentencing was set for a later date.

The trial of Mr. Harmon's co-defendants apparently went forward as scheduled. Mr. Harmon was not called as a witness, and the co-defendants were acquitted.

Before Mr. Harmon was sentenced, a probation officer filed a pre-sentence report recommending (1) that Mr. Harmon be ordered to make restitution in the amount of $39,000; (2) that Mr. Harmon receive a two-level reduction in his offense level for acceptance of responsibility; and (3) that his base offense level be increased by an increment linked to victim losses totaling $644,000. Working from the 2002 edition of the Guidelines Manual, the probation officer reported that Mr. Harmon had a total offense level of 21 and belonged in Criminal History Category I. The sentence range prescribed for these variables by the manual's Sentencing Table, as the report noted, is imprisonment for 37-46 months.

The government presented three objections to the report. The first objection dealt with the amount of restitution; the government maintained that Mr. Harmon should be required to make restitution in the full amount of $644,000, less $1,720 that had already been repaid. The second objection was that a pre-2002 edition of the Guidelines Manual should have been used, thus avoiding what the government perceived to be an *ex post facto* problem in using the edition in effect at the time of sentencing. The third objection was that "the value of the funds" used in determining Mr. Harmon's offense level should have been an amount less than $100,000, not an amount in excess of $600,000. The government's recommendation was that the court impose "a sentence in the range of 24 to 30 months incarceration and restitution in the amount of $642,800 . . . ."

At Mr. Harmon's sentencing hearing, which was held in July of 2003, the prosecutor advised the court that the parties had agreed on a restitution order in the amount of $642,280. As to which edition of the Guidelines Manual should be used, the prosecutor recommended use of either the 2000 edition or the 1998 edition. (There was no relevant difference between those two versions, according to the prosecutor.)

With regard to the computation of Mr. Harmon's offense level, the prosecutor explained that in the negotiations preceding the plea he had insisted that Mr. Harmon plead to one of the § 1957 "monetary transaction" counts because that would result in a higher offense level (and thus a higher guideline sentence range) than a plea to any or all of the wire fraud counts. The prosecutor told the court that under *United States v. Selby*, 1994 WL 416262 (6th Cir. 1994) (unpublished), conviction on the § 1957 count meant that the amount of the monetary transaction covered by that count would be aggregated with the amount of the monetary transaction covered in the other § 1957 count, producing a total of less than $100,000. The offense level yielded by that metric, the prosecutor continued, meant that Mr. Harmon's guideline sentence range, calculated in accordance with the "monetary transaction" guideline, would be imprisonment for 24 to 30 months. If Mr. Harmon had pleaded guilty to wire fraud, on the other hand, the aggregation of all 29 of the wire fraud counts would have produced a lower offense level under the wire fraud guideline and thus a lower guideline sentence range.

Referring the court to *United States v. Taylor*, 984 F.2d 298 (9th Cir. 1993), a case also cited in his written objections to the pre-sentence report, the prosecutor submitted that the value of the

funds used in determining the offense level for a § 1957 violation should be the amount of criminally derived property that was the subject of the monetary transaction, not the entire amount of the losses suffered by the victims of the fraud. According to *Taylor*, as the prosecutor put it, "[y]ou don't aggregate that entire wire fraud amount to increase the offense level [for the monetary transaction offense.]"

Although counsel for the defendant agreed with the prosecutor, the district court did not. Quoting from *United States v. Kappes*, 936 F.2d 227, 229 (6th Cir. 1991), a decision cited in *Selby*, the court pointed out that "[t]he goal of the relevant conduct provision is to allow a court to impose sentences commensurate with the gravity of the offenses. [U.S.S.G. § 1B1.3(a)(2) states that the base offense level] 'shall be determined on the basis of . . . all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" And "no matter which way you look at it," the district court continued, "all of the these [fraudulent] transactions [described generally in the allegations incorporated at the outset of Count 30] were part of a common plan and scheme." Using a total value of $642,000, the district court ruled that Mr. Harmon's offense level was 21 and his guideline sentence range was 37 to 46 months. It was the judgment of the court that Mr. Harmon be incarcerated for a term of 37 months and be ordered to make restitution in the amount of $642,280.

With the imposition of this sentence, the government moved to dismiss the remaining counts of the indictment. The motion was granted. Mr. Harmon subsequently perfected a timely appeal. The government has now changed its position on the appropriateness of a 37-month sentence, arguing on appeal that the sentence should be affirmed.

II

Normally, of course, the edition of the Guidelines Manual in effect at the time of sentencing is the edition that should be used. See U.S.S.G. § 1B1.11(a). When use of that edition would violate the *ex post facto* clause of the Constitution, however (*i.e.*, when it would produce a higher sentence range than the version in effect when the crime was committed), the earlier edition is to be used. See U.S.S.G. § 1B1.11(b).[1]

When Mr. Harmon was sentenced, the November 1, 2002, edition of the manual was in effect. It is therefore appropriate to first determine the sentence range under 2002 edition and then see how that range compares with the one yielded by the edition in effect at the time of the crime.

A

The manual's Statutory Index identifies Guideline 2S1.1 as the offense guideline section applicable to 18 U.S.C. § 1957, Mr. Harmon's "statute of conviction." Turning to § 2S1.1, we find that the 2002 version of this guideline covers both "Laundering of Monetary Instruments" and "Monetary Transactions in Property Derived from Unlawful Activity."

Guideline 2S1.1 provides alternative methods for determining a defendant's base offense level. (The "base offense level," it will be recalled, is a floor that may be adjusted on the basis of designated "specific offense characteristics.")

---

[1]The experience of working with the federal sentencing guidelines, as those who labor in this somewhat overgrown vineyard have often remarked, is not unlike that of working with the federal income tax code. And § 1B1.11(b) bears some resemblance to a negative Alternative Minimum Tax. The AMT requires computation of the income tax two different ways, and the higher result must be used. Section 1B1.11(b) requires computation of the sentence range two different ways, when there have been relevant changes in the guidelines, and the lower result must be used.

Section 2S1.1(a)(1) describes the first method of determining the base offense level; it says that if both of two specified conditions are met, the offense level is the same as that "for the underlying offense from which the laundered funds were derived . . . ." ("Laundered funds," as that term is used here, includes funds involved in a monetary transaction violating 18 U.S.C. § 1957. See U.S.S.G. § 2S1.1, comment. (n.1).) Otherwise, § 2S1.1(a)(2) says, the second method is used. Under that method the base offense level is 8 plus a number of offense levels from a designated table "corresponding to the value of the laundered funds  . . . ."

The two conditions that must be met if the base offense level is to be determined under the first method are these:  "(A) the defendant committed the underlying offense . . ." and "(B) the offense level for that offense can be determined . . . ." § 2S1.1(a)(1).  Both conditions are met in the case at bar.  Mr. Harmon testified under oath that he fraudulently induced Dr. Chachoua to wire $300,000 to Harmony, and the offense level for this act of wire fraud is capable of ascertainment. Accordingly, as we read § 2S1.1, the second method of determining the base offense level — the method set forth in § 2S1.1(a)(2) —  has no application in this case.  (The probation officer who prepared Mr. Harmon's pre-sentence report used the second method, but it seems clear to us that she erred in doing so.)

Under § 2S1.1(a)(1), as we have seen, the base offense level for Mr. Harmon's "monetary transaction" offense is identical to the offense level for the underlying wire fraud offense from which the $39,000 covered by Count 30 was derived.  The wire fraud offense level is prescribed by U.S.S.G. § 2B1.1, which is the offense guideline for (among other things) "Fraud and Deceit."

Section 2B1.1(a) specifies a wire fraud base offense level of 6.  Under the "Specific Offense Characteristics" subsection, U.S.S.G. § 2B1.1(b)(1), this base offense level is to be increased in accordance with a designated scale if "the loss" exceeded $5,000.  "The loss," in this instance, may or may not be limited to the $300,000 loss suffered by Dr. Chachoua.  That depends on the application of U.S.S.G. § 1B1.3, which deals among other things with the determination of specific offense characteristics and which makes reference to the "grouping" of closely related counts under § 3D1.2.  Whether, in this particular hall of mirrors, the $300,000 fraud should be "grouped" with the other acts of wire fraud charged in the indictment is a question that need not detain us.  For present purposes it is sufficient to say that if "the loss" referred to in § 2B1.1(b)(1) is to be calculated on the basis of all acts of fraud committed and aided and abetted by Mr. Harmon as part of the same course of conduct or common scheme or plan, Mr. Harmon's offense level would be increased to 20.  See § 2B1.1(b)(1)(H).  Otherwise it would only be increased to 18.  See § 2B1.1(b)(1)(G).  The level calculated under § 2B1.1(b)(1), whether it be 18 or 20, then becomes the base offense level under the monetary transaction guideline, § 2S1.1(a)(1).

The latter guideline's own "Specific Offense Characteristics" subsection, § 2S1.1(b), calls for a further increase of one level.  See U.S.S.G. § 2S1.1(b)(2)(A) ("If the defendant was convicted under 18 U.S.C. § 1957, increase by 1 level").  Such an increase brings Mr. Harmon's offense level to either 19 or 21.

The district court and the parties were in agreement that Mr. Harmon was entitled to an offense-level reduction of two levels under § 3E1.1(a), based on his acceptance of responsibility. Such a reduction would bring Mr. Harmon's offense level to either 17 or 19.

It is undisputed that Mr. Harmon belonged in Criminal History Category I.  For a defendant in that category, an offense level of 17 yields a sentence range of 24-30 months.  An offense level of 19 yields a range of 30-37 months.  We see no arguable basis for interpreting the 2002 edition of the manual as producing the 37-46 month range recommended by the probation officer and accepted by the district court.

B

The district court believed that the version of the manual which took effect on November 1, 1998, was the version in effect when Mr. Harmon's crime was committed. The government appears to have acquiesced in that view, which seems reasonable to us. Accordingly, we turn now to the question of what sentence range was prescribed by the 1998 edition of the manual.

Under the 1998 version, the offense guideline section for monetary transactions violating 18 U.S.C. §1957 was U.S.S.G. § 2S1.2. The base offense level specified in § 2S1.2(a) was 17. The potentially relevant specific offense characteristics subsection, U.S.S.G. § 2S1.2(b)(2), gave this instruction: "If the value of the funds exceeded $100,000, increase the offense level as specified in § 2S1.1(b)(2)."

The latter subsection (which prescribed a graduated scale of specific offense characteristic increases for "Laundering of Monetary Instruments" in violation of 18 U.S.C. § 1956) said that "[i]f the value of the funds exceeded $100,000," the offense level should be increased in accordance with the graduated scale. The scale indicated that if the value of the funds was more than $600,000 and not more than $1 million, there should be a 4-level increase. If the value of the funds was $100,000 or less, the scale called for no increase.

What was "the value of the funds" as far as the case at bar is concerned? The prosecutor and Mr. Harmon, as we have seen, contended that it was less than $100,000. Their contention was based on the fact that the monetary transactions described in the § 1957 counts of the indictment totaled $89,000. The opinion in *United States v. Taylor*, 984 F.2d 298 (9th Cir. 1993), was cited by the prosecutor in support of the proposition that this figure represented "the value of the funds."

The facts of *Taylor* closely resemble the facts of the present case. Having contracted to sell a quantity of telephones to a foreign purchaser for $360,000, Mr. Taylor had obtained two letters of credit, one for $219,600 and the other for $140,400, payable upon shipment of the telephones. Mr. Taylor sent the buyers crates that proved to contain bricks instead of telephones. The issuers of the letters of credit honored the letters before the fraud was discovered, paying the funds into a designated bank account. Mr. Taylor then transferred $219,600 from the bank account to a brokerage account at another institution.

Mr. Taylor was indicted on one count of wire fraud, one count of money laundering, and one count of engaging in a monetary transaction in criminally derived property. It was the $219,600 transfer from the bank account to the brokerage account that formed the basis of the monetary transaction count.

Mr. Taylor pleaded guilty to the monetary transaction count alone; the remaining counts were dismissed. At sentencing the district court enhanced Taylor's offense level by using $360,000 — the entire amount involved in the fraudulent scheme — as "the value of the funds" which governed the number of offense levels to be added under the scale set forth in § 2S1.1(b)(2). The government conceded, on appeal, that the district court should have used only the $219,600 involved in the count of which Taylor was convicted. The court of appeals agreed.

The theory adopted in *Taylor* was based on the court's reading of U.S.S.G. § 1B1.3, the section dealing with "Relevant Conduct." (This is the same section on which the district court relied in the case at bar.) Section 1B1.3(a) provides in general that specific offense characteristics, among other things, shall be determined on the basis of a laundry list that includes the following:

"(1)(A)     all acts . . . committed . . . by the defendant

* * *

that occurred during the commission of the offense of conviction [or] in preparation for that offense . . .;

(2)     *Solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts*, all acts and omissions described in subdivision[] (1)(A) . . . above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts specified in subsections (a)(1) and (a)(2) above . . . and

(4)     any other information specified in the applicable guideline." (Emphasis supplied.)

Focusing on § 1B1.3(a)(2), the subpart that speaks of "grouping" multiple counts under § 3D1.2(d), the *Taylor* court noted that

"Section 3D1.2(d) provides that counts shall be grouped '[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm.' Section 3D1.2(d) requires grouping 'when the measurement of harm from one offense is essentially equivalent to the measurement of harm for other related offenses.' *United States v. Johnson*, 971 F.2d 562, 576 (10th Cir. 1992). . . ." *Taylor*, 984 F.2d at 303.

The key to determining whether "grouping" was appropriate under § 3D1.2(d), the *Taylor* court continued, would be a determination of whether the measures of harm in the relevant offense guidelines were "essentially equivalent." *Id.* The court went on to hold as follows:

"We join the Tenth Circuit in holding that grouping under section 3D1.2(d) is not appropriate when the guidelines measure harm differently. *See Johnson*, 971 F.2d at 576. Here, as in *Johnson*, the guidelines for wire fraud and money laundering measure harm differently. Thus, as the government concedes, the dismissed wire fraud count cannot be grouped with the monetary transaction count under section 3D1.2(d). Accordingly, funds attributable to the dismissed wire fraud count are not relevant conduct under section 1B1.3(a)(2)." *Id.* (Footnote omitted.)

The holding in *Taylor* seems correct to us, although its status after the Sentencing Commission's adoption of Amendment 634 (discussed in n.2, *infra*) is highly dubious. As the Court of Appeals for the Tenth Circuit explained in *Johnson*, the harm being measured under the guideline for offenses involving fraud differs in kind from the harm being measured under the guideline for money laundering offenses (or, by extension, the guideline for monetary transactions in criminally derived property). Determination of a fraud loss "requires an assessment of the impact of the fraud on the individual victims." *Johnson*, 971 F.2d at 576. The money laundering guideline, in contrast,

"is not based on the amount of the loss. It is based on the value of the funds involved in the laundering transaction. The harm from such a transaction does not generally fall upon an individual but falls upon society in general." *Id.*[2]

In the case at bar the district court apparently concluded that the two types of offense are of a character for which § 3D1.2 would require grouping. On that basis the court read § 1B1.3(a)(2) as requiring the court to look at all of Mr. Harmon's acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." This would probably have been a correct reading of the 2002 edition of the guidelines, but we are satisfied that it was not a correct reading of the unamended 1998 edition.

Because, under the earlier edition of the manual, "the value of the funds" did not exceed $100,000, Mr. Harmon's offense level remained at 17. The resulting sentence range is 24-30 months. As this range is equal to or lower than the possible ranges under the 2002 edition, it is the range that should be considered on remand.

### III

Mr. Harmon's sentence is **VACATED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

---

[2] Effective November 1, 2001 — a date subsequent to commission of the offense with which Mr. Harmon was charged in Count 30 of the indictment — the Sentencing Commission replaced §§ 2S1.1 and 2S1.2 of the guidelines with an amended § 2S1.1 that consolidated the offense guidelines for convictions under 18 U.S.C. § 1956 (money laundering) and 18 U.S.C. § 1957 (engaging in monetary transactions in criminally derived property). See U.S. Sentencing Commission Guidelines Manual Supplement to Appendix C, Amendment 634. A new application note (n.6) in the accompanying commentary reads as follows:

> "*Grouping of Multiple Counts*. — In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2 (Groups of Closely-Related Counts)."

If the new application note had been in effect at the time of Mr. Taylor's sentencing and Mr. Harmon's crime, the note would not have been directly relevant — for while both men were "convicted of a count of laundering funds [under the amended guideline's expanded definition of 'money laundering']," neither man was convicted of "a count for the underlying offense from which the laundered funds were derived." The defendant in the 10th Circuit's *Johnson* case, on the other hand, seems to have been convicted both of one count of wire fraud and multiple counts under 18 U.S.C. §§ 1956 and 1957.

The Sentencing Commission's explanation of the reason for the addition of Application Note 6 by Amendment 634 states that "[i]n a case in which the defendant is to be sentenced on a count of conviction for money laundering and a count of conviction for the underlying offense that generated the laundered funds, this application note instructs that such counts shall be grouped pursuant to subsection (c) of § 3D1.2 . . . thereby resolving a circuit conflict on this issue." *Johnson* was one of the cases cited in this connection. *Taylor* was not cited, although the Commission did cite a subsequent 9th Circuit decision, *United States v. Hanley*, 190 F.3d 1017 (1999), that relied on *Taylor*. Unlike Mr. Taylor, however, Mr. Hanley was actually convicted of wire fraud as well as money laundering.