United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 10, 2006**

Charles R. Fulbruge III
Clerk

REVISED APRIL 17, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-10360

UNITED STATES OF AMERICA

                    Plaintiff - Appellee

     v.

IRAELIO CHARON

                    Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, SMITH, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

Defendant-appellant Iraelio Charon appeals his sentence, arguing that: (1) the district court erred by using relevant conduct to calculate his base offense level under U.S. Sᴇɴᴛᴇɴᴄɪɴɢ Gᴜɪᴅᴇʟɪɴᴇs Mᴀɴᴜᴀʟ § 2S1.1(a)(1) (2004) [hereinafter U.S.S.G.]; (2) the district erred by enhancing his sentence for sophisticated laundering under U.S.S.G. § 2S1.1(b)(3); and (3) the application of Justice Breyer's remedial holding in United States v. Booker, 543 U.S. 220 (2005), violates the Ex Post Facto and Due Process

-1-

Clauses.  For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In March 2003, a confidential source told special agents with the Drug Enforcement Administration ("DEA") in Dallas, Texas that Iraelio Charon was selling cocaine in the Fort Worth, Texas area.  The agents' investigation revealed that on September 13, 1985, Charon was convicted in federal district court of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846.[1]  Agents arranged for an informant to purchase cocaine from Charon.  Several transactions occurred between the informant and Charon, in which the informant would purchase a substance containing a detectable amount of cocaine from Charon.[2]  The transaction on December 19, 2003, when Charon sold approximately 995 grams of cocaine to the informant, formed the basis for count one of the information.

---

[1]  This information was contained in the penalty information filed by the government pursuant to 21 U.S.C. § 851.  As part of his written plea agreement, Charon agreed that this information was true and correct.

[2]  The parties stipulated to the following transactions in the factual resume:  April 8, 2003 (informant met with Charon and purchased 124.6 grams of a substance containing cocaine); August 26, 2003 (informant met with Charon and purchased 498.2 grams of a substance containing cocaine); September 9, 2003 (informant met with Charon and purchased 498.2 grams of a substance containing cocaine); November 11, 2003 (informant met with Charon and purchased 499.5 grams of a substance containing cocaine); December 19, 2003 (informant met with Charon and purchased 995.1 grams of a substance containing cocaine).  As part of his plea agreement, Charon agreed that the factual resume was true and correct.

The investigation further revealed that on September 18, 2002, Charon purchased property located at 2622 Edgewood Terrace in Fort Worth. As a down payment on the property, Charon tendered a cashier's check in the amount of $20,000. The cashier's check was purchased for Charon by a third party in the third party's name. Charon provided the funds for the cashier's check from drug proceeds. As stipulated by the parties in the factual resume, this property transaction was designed to allow Charon to make a legitimate investment using drug proceeds, while concealing the source of the funds. This conduct formed the basis for count two of the information, which alleged that Charon conducted a financial transaction involving drug proceeds.

On October 28, 2004, Charon was charged by an information filed by the government with one count of distributing more than five hundred grams of a mixture and substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and one count of laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). On November 12, 2004, Charon waived prosecution by indictment and consented to proceed by the two-count information. That same day, Charon pleaded guilty to both counts pursuant to a written plea agreement.

In the Presentence Report ("PSR"), the probation officer noted that Charon was convicted of two counts that required grouping under U.S.S.G. §§ 3D1.1 and 3D1.2(d). Because the money laundering offense produced the higher offense level, the

probation officer used it to calculate the base offense level. See U.S.S.G. § 3D1.3(b) (providing that when counts involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level applies). The probation officer determined that the base offense level for the money laundering offense should be determined by using the underlying offense from which the laundered funds were derived, as well as specific offense characteristics. See id. § 2S1.1(a)(1). Because the laundered funds were derived from Charon's cocaine distribution business, the probation officer used U.S.S.G. § 2D1.1, which determines the base offense level using the drug quantity table, to come up with a base offense level of 36. See id. § 2D1.1(c)(2) (indicating a base offense level of 36 for an offense involving at least fifty kilograms but less than 150 kilograms of cocaine).[3] The probation officer added two levels to arrive at a base offense level of 38 after adjusting for Charon's possession of a firearm. See id. § 2D1.1(b)(1).

After arriving at a base offense level of 38, the probation

---

[3] The probation officer noted that as a result of their investigation, DEA agents were able to identify Charon and his sources of cocaine supply and track their illegal activities. The PSR indicated that "[i]ntercepted telephone calls by DEA agents, interviews of cooperating individuals, and an undercover meeting with Charon revealed Charon purchased and distributed between 70 kilograms and 150 kilograms of cocaine during the investigation." PSR ¶ 10. However, according to the report, "[t]he amount of cocaine purchased by undercover officers/informants from Charon was 2 kilograms." Id.

officer added two points because Charon was convicted under 18 U.S.C. § 1956, see id. § 2S1.1(b)(2)(B), and added another two points because the offense involved sophisticated money laundering, see id. § 2S1.1(b)(3). The probation officer then subtracted three points for Charon's acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)-(b). Based on these adjustments, the probation officer recommended a total offense level of 39. With Charon's criminal history category of VI, the recommendation resulted in a guideline imprisonment range of 360 months to life. The probation officer noted, however, that the maximum term of imprisonment that may be imposed for count two is 240 months. See 18 U.S.C. § 1956(a)(1).

Charon filed written objections to the PSR, disputing the probation officer's calculation of the base offense level under U.S.S.G. § 2S1.1(a)(1) and the two-level enhancement for sophisticated laundering under U.S.S.G. § 2S1.1(b)(3). First, he argued that his base offense level should have been based solely on the drugs underlying his money laundering conduct, rather than his total amount of relevant conduct for drug dealing. Second, he contended that his method of purchasing the property was not a sophisticated laundering transaction and that the enhancement under U.S.S.G. § 2S1.1(b)(3) was therefore improper.

In an addendum to the PSR, the probation officer maintained that the base offense level of 38 was applicable and that the enhancement for sophisticated laundering was appropriate. With

-5-

regard to Charon's objection to the base offense level, the probation officer noted that Charon was convicted of distribution of cocaine, as well as the money laundering offense. According to the probation officer, "[t]he base offense level is determined by using the underlying offense, [d]istribution of [c]ocaine and all relevant conduct, from which the laundered funds were derived (the defendant's cocaine trafficking business)." The probation officer also noted that the relevant conduct provisions do not limit the drug quantities to that stipulated by the defendant in his factual resume.

In response to Charon's objection to the enhancement under U.S.S.G. § 2S1.1(b)(3), the probation officer stated that

> sophisticated laundering typically involves the use of two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate. In this case, the defendant was a drug dealer and he regularly engaged in laundering his criminal proceeds by: opening various checking and/or money-marketing accounts and making cash deposits; using his wife to open an account in her name, and making unexplained cash deposits; asking a third person to purchase a cashier's check and purchasing property with the cashier's check to disguise the criminal proceeds. . . . The defendant's actions constitute "layering" within the meaning of [U.S.S.G.] § 2S1.1.

Charon objected to the addendum, re-urging his objections and adding an objection based on United States v. Booker, 543 U.S. 220 (2005). He argued that after Booker, his base offense level could not be determined based on information not alleged in the information, admitted to by him, or proven to a jury beyond a

-6-

reasonable doubt. He also contended that the Ex Post Facto and Due Process Clauses prohibit the district court from applying Booker's remedial opinion to his case.

At sentencing, the district court overruled Charon's objections to the PSR and his objections based on Booker.[4] In doing so, the district court specifically adopted as the fact findings and conclusions of the court the facts and conclusions as set forth in the PSR and the addendum to the PSR. The district court also found that Charon had provided substantial assistance to the government and granted the government's motion for downward departure. In considering the advisory nature of the Guidelines, the court stated:

> Well, I am going to take into account the defendant's cooperation with the government. Of course, I'm also taking into account his serious criminal history and his extensive drug activity in this case. Actually, his conduct, as reflected by the presentence report, would establish a mandatory life sentence if he had actually been convicted of his offense conduct. . . . I'm going to give him a significant departure below the bottom of the advisory guidelines.

The district court sentenced Charon to 240 months in prison, eight years of supervised release, and a $200 mandatory special assessment. In doing so, the court noted that it was departing ten years below the advisory guideline minimum of 360 months.

---

[4] In ruling on Charon's objections, the district court stated: "Well, I'll overrule all of the objections. . . . And, of course, that includes the objection that an application of the ruling, the recent Supreme Court decisions to this case constitutes an ex post facto application on the law."

The district court judge further stated that he believed the sentence he was imposing "takes into account and properly considers all of the factors that are mentioned in Title 18, United States Code, Section 3553."

Charon now appeals, arguing that: (1) the district court erred by using relevant conduct to calculate his base offense level under U.S.S.G. § 2S1.1(a)(1); (2) the district court erred by imposing a two-level enhancement for sophisticated laundering pursuant to U.S.S.G. § 2S1.1(b)(3); and (3) the district court's application of Justice Breyer's remedial holding in <u>United States v. Booker</u>, 543 U.S. 220 (2005), violates the Ex Post Facto and Due Process Clauses.

## II. DISCUSSION

### A. Base Offense Level Under U.S.S.G. § 2S1.1(a)(1)

Charon argues that the district court's calculation of his base offense level should have been based only on the drugs that were directly related to his money laundering offense, rather than his drug dealing relevant conduct. According to Charon, U.S.S.G. § 2S1.1(a)(1) does not direct the court to apply relevant conduct; instead, the guideline limits the offense level determination to the underlying offense from which the laundered funds were derived. Charon contends that the Sentencing Commission's reasons for amending § 2S1.1(a)(1) illustrate that the Commission did not intend for courts to consider relevant

conduct. As support for his argument, Charon points out that the Commission listed the base offense level, special offense characteristics, cross references, and special instructions as considerations for determining the base offense level for the underlying offense, but did not mention relevant conduct. See U.S.S.G. app. C at 227-30 (Supp. Nov. 2002).

Although the Sentencing Guidelines are now advisory, a district court is still required to calculate the guideline range. United States v. Angeles-Mendoza, 407 F.3d 742, 746 (5th Cir. 2005) (citing Booker, 543 U.S. at 245-46, and United States v. Mares, 402 F.3d 511, 518-19 (5th Cir. 2005), cert. denied, 126 S. Ct. 43 (2005)). In addressing Charon's challenge to the district court's calculation of his guideline range, we continue after Booker to review the district court's interpretation and application of the Guidelines de novo and its factual determinations for clear error. See United States v. Solis-Garcia, 420 F.3d 511, 513-14 (5th Cir. 2005); see also United States v. Villanueva, 408 F.3d 193, 203 n.9 (5th Cir. 2005) (noting that this court continues to review factual findings with respect to the application of the Guidelines for clear error); United States v. Villegas, 404 F.3d 355, 359 (5th Cir. 2005) (concluding that this court continues after Booker to review the district court's interpretation and application of the Guidelines de novo).

The issue presented for our review is whether, in

calculating the base offense level under U.S.S.G. § 2S1.1(a)(1), the "underlying offense" includes relevant conduct. The guideline itself provides no guidance as to how "offense level for the underlying offense" is to be determined when there is only one underlying offense. Cf. U.S.S.G. § 2S1.1 cmt. n.2(A) ("Multiple Underlying Offenses"). Although one court has intimated, though not held, that relevant conduct can be used under § 2S1.1(a)(1),[5] we have found no published or unpublished decisions, by this circuit or otherwise, holding that the "underlying offense" in § 2S1.1(a)(1) includes relevant conduct.

The proper starting point for this discussion is the guideline itself. The manual's statutory index identifies U.S.S.G. § 2S1.1 as the offense guideline section applicable to 18 U.S.C. § 1956, one of Charon's statutes of conviction. Section 2S1.1 provides alternative methods for determining a defendant's base offense level. See United States v. Harmon, 409 F.3d 701, 706 (6th Cir. 2005). Section 2S1.1(a)(1) describes the first method of determining the base offense level, stating that if two specified conditions are met, the base offense level is "[t]he offense level for the underlying offense from which the

---

[5] See United States v. Harmon, 409 F.3d 701, 710 (6th Cir. 2005) (stating in dicta that although the district court applied the wrong edition of the Guidelines, the district court's calculation of the offense level under § 2S1.1(a)(1) based on relevant conduct "would probably have been a correct reading of the 2002 edition of the guidelines").

laundered funds were derived . . . ."[6]  The two conditions under (a)(1) are: (1) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (2) the offense level for that offense can be determined.  U.S.S.G. § 2S1.1(a)(1).  Alternatively, if the two specified conditions are not met, the second method is used, which defines the base offense level as "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds."  Id. § 2S1.1(a)(2).  The commentary to this guideline clarifies that (a)(2) applies to any case in which (1) the defendant did not commit the underlying offense, or (2) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine. Id. § 2S1.1 cmt. n.3(A).

Both conditions for (a)(1) are satisfied in this case.  The two counts that Charon pleaded guilty to--a drug distribution

---

[6]  The guideline defines "laundered funds" as "property, funds, or monetary instrument involved in the transaction" in violation of 18 U.S.C. § 1956.  U.S.S.G. § 2S1.1 cmt. n.1. Because the term "underlying offense" is not defined in the guideline, "offense" arguably takes on its ordinary meaning under § 1B1.1, which defines "offense" as "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or otherwise clear from the context."  Id. § 1B1.3 cmt. n.1(H).

count occurring on December 19, 2003, and a money laundering count occurring on September 18, 2002--do not by themselves tell us whether Charon "committed the underlying offense" because the money laundering offense occurred over one year prior to the drug distribution offense. Nevertheless, based on our review of the record, we are satisfied that Charon committed or was involved in the commission of the offense underlying his money laundering offense. See id. § 2S1.1 cmt. n.2(B). Charon admitted, as part of the factual resume that was incorporated into his plea agreement, that "[t]he funds for the cashier's check were proceeds of [his] dealing in cocaine," that he provided the funds to the third party, and that the transaction was designed "to set up a legitimate investment using drug proceeds, while concealing the source of the funds." The second condition to § 2S1.1(a)(1) is also satisfied because the offense level for cocaine distribution can be determined by using the drug quantity table in § 2D1.1(c).

The PSR, as adopted by the district court, recognized that although § 2S1.1 was the applicable guideline for Charon's count of money laundering, § 3D1.1(d) instructs that offenses under §§ 2S1.1 and 2D1.1 are to be grouped. Neither party disputes that grouping was required or the method in which the district court grouped the offenses.[7] Section 3D1.3(b) directs the court

---

[7] The parties do not mention the commentary to U.S.S.G. § 2S1.1 concerning grouping under § 3D1.2(c). See U.S.S.G.

to apply the offense guideline that produces the highest offense level. The district court, in adopting the PSR, determined that guideline to be § 2S1.1. Again, neither party argues with the district court's application of the money laundering offense guideline as producing the higher offense level.

The parties dispute the district court's next step, in which it incorporated relevant conduct to calculate Charon's underlying drug distribution offense. Under U.S.S.G. § 1B1.3(a)(2), however, the district court properly considered relevant conduct as part of the underlying offense. Section 1B1.3(a)(2) states that "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts [as here], all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction" shall be used in determining the base offense level. The district court, in following the addendum to the PSR, concluded that the base offense level in this case should be calculated by using the underlying offense for distribution of cocaine and all relevant conduct.

Although Charon argues that the Sentencing Commission did not direct the courts to use relevant conduct, relevant conduct is inherent in the grouping rules under § 3D1.2(d). Charon is

---

§ 2S1.1 cmt. n.6. As neither party challenged the grouping of Charon's counts before the district court or before this court, we need not decide the specific application of that commentary note.

correct that the reasons for the amendment to § 2S1.1 do not list relevant conduct; however, the amendment also does not direct the court to apply the grouping rules of § 3D1.2(d) any differently than that provision requires. In other words, analysis under § 3D1.2(d) necessarily takes into account the "relevant conduct" provisions of the Guidelines, and § 2S1.1(a)(1) does not require the court to do anything differently under that section. See United States v. Paulk, 917 F.2d 879, 883 (5th Cir. 1990) ("Relevant conduct for offenses to which section 3D1.2(d) applies is governed by section 1B1.3(a)(2), which allows the court to consider 'all such acts or omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"). Accordingly, it was not error for the district court to consider relevant conduct. Because Charon does not challenge the amount of drugs attributed to him as relevant conduct, we need not address that issue in this appeal.

**B.    Sophisticated Laundering Enhancement Under U.S.S.G. § 2S1.1(b)(3)**

Charon next argues that the district court erred by imposing a two-level enhancement for sophisticated laundering under U.S.S.G. § 2S1.1(b)(3). Charon contends that he did not engage in sophisticated money laundering because he merely gave a third party $20,000 in cash (from drug proceeds) to purchase a cashier's check in the third party's name, which he then used as a down payment on a piece of property. This conduct, according

-14-

to Charon, is not sophisticated because it does not meet the requirements of U.S.S.G. § 2S1.1(b)(3), which requires "complex or intricate offense conduct" in order to be classified as "sophisticated laundering."  To the extent the PSR relied on other activities to show that Charon engaged in sophisticated laundering, such as the fact that he opened numerous banking accounts, had his wife open an account, and made large, unexplained cash deposits, he claims that the district court erred in adopting this information and using it to enhance his sentence because he provided the information pursuant to a cooperation agreement.  Charon maintains that "[u]nless there is some independent source, that information [obtained through his cooperation with the government] could not be used to enhance [his] guideline sentence."

As an initial matter, we must address Charon's contention that the information used by the district court regarding his various checking accounts and large cash deposits was obtained solely from his cooperation with the government and that this information cannot be used absent an independent source.  Whether the use of Charon's debriefing information to enhance his sentence violates the Sentencing Guidelines or his agreement with the government is a question of law that we review de novo.  See United States v. Gonzalez, 309 F.3d 882, 886 (5th Cir. 2002) (noting that whether the government's use of information provided by the defendant in a debriefing violated the plea agreement is a

question of law that the court reviews de novo).

Section 1B1.8 of the Guidelines states that

[w]here a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S.S.G. § 1B1.8(a). In United States v. Gonzalez, we looked to the plea agreement in that case to determine if the government could disclose information obtained during the defendant's debriefing. 309 F.3d at 886. We concluded that the plea agreement indicated that the government could disclose this information only if certain exceptions applied. Id. After determining that none of the exceptions in the plea agreement applied, we held that the government was not allowed to use the information against the defendant absent a showing that the information came from a wholly independent source. Id. at 886-87.

The record in this case simply does not support Charon's argument. First, Charon has not pointed to anything in the record indicating that his cooperation agreement with the government precluded the government from using this information. See U.S.S.G. § 1B1.8(a). In fact, our extensive review of the record supports the opposite conclusion--namely that the government did not make any agreement with Charon concerning its

-16-

use of this information.[8]  Neither paragraph six of the plea agreement, entitled "Defendant's cooperation," nor paragraph seven, entitled "Government's agreement," includes any sort of agreement as envisioned by U.S.S.G. § 1B1.8(a), whereby the government agrees not to use self-incriminating information provided by the defendant in his cooperation with the government. Cf. Gonzalez, 309 F.3d at 886 (stating that the plea agreement allowed the government to disclose information obtained during the debriefing only under certain circumstances).

Second, the record does not support Charon's contention that the information concerning the various accounts and cash deposits came only from his cooperation with the government.  Rather, the record reveals that the offense conduct presented in the PSR was gathered during an independent investigation conducted by the probation officer.  The probation officer pointed out in the PSR that specific offense details were gleaned from numerous investigative reports prepared by a DEA agent and an Internal Revenue Service special agent.  In addition, the probation officer conducted an interview with both of these agents to clarify and corroborate details contained in the investigative

---

[8]  Although the record contains a copy of the plea agreement, it does not contain a separate "cooperation agreement."  Notably, if the parties entered into a separate cooperation agreement, it should have been in writing pursuant to paragraph eleven of the plea agreement, which states that the plea agreement is a complete statement of the parties' agreement and cannot be modified unless in writing and signed by both parties.

material.

Simply put, the record does not support Charon's contention that the details concerning his accounts and deposits came only from his cooperation with the government, but instead indicates that the probation officer obtained this information from independent sources.  See United States v. Miller, 406 F.3d 323, 335 (5th Cir. 2005) (noting that contrary to the defendant's argument that his statements are protected by the cooperation and plea agreement and U.S.S.G. § 1B1.8 and therefore could not be considered at sentencing, "the record is replete with information on which the court could have reached the same conclusions independently of the disputed admissions"), cert. denied, 126 S. Ct. 207 (2005).  Accordingly, we find Charon's argument that the district court should not have considered the information relating to his various accounts and cash deposits to be without merit.

Turning to Charon's argument that the district court erred by enhancing his sentence under U.S.S.G. § 2S1.1(b)(3), we will reverse the district court's finding that Charon's conduct involved sophisticated laundering only if that finding is clearly erroneous.  See United States v. Miles, 360 F.3d 472, 481 (5th Cir. 2004) (reviewing the district court's finding of sophisticated laundering under § 2S1.1(b)(3) for clear error).[9]

_____

    [9] In deciding the appropriate standard of review for a finding of sophisticated money laundering, we recently noted, in

-18-

"'If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently,' or similarly, a factual finding is not clearly erroneous unless 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" United States v. Harris, 434 F.3d 767, 773 (5th Cir. 2005) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400 (1990), and United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

Here, the district court adopted the factual findings and

---

United States v. Miles, that U.S.S.G. § 2S1.1(b)(3) is relatively new and this court has not yet examined its application. However, this court has reviewed for clear error a district court's factual determination whether sophisticated means were used in the commission of an offense under another sentencing guideline. See United States v. Powell, 124 F.3d 655, 666 (5th Cir. 1997) (examining 1995 Sentencing Guideline § 2T1.1 [which concerns using sophisticated means for tax evasion]); United States v. Clements, 73 F.3d 1330, 1340 (5th Cir. 1996) (same). Clear error should be the standard in this case, too, because "layering" of transactions, which the court found to exist, is defined as a form of sophisticated money laundering by the guidelines commentary. See U.S.S.G. § 2S1.1, cmt. n.5(A) (2001). 360 F.3d at 481.
    This standard of review is unchanged by Booker because, as we previously mentioned, this court continues to review the district court's interpretation and application of the Guidelines de novo and its factual findings for clear error. See Solis-Garcia, 420 F.3d at 513-14.

-19-

conclusions of the PSR and the addendum to the PSR in concluding

that Charon's sentence should be enhanced by two levels pursuant

to U.S.S.G. § 2S1.1(b)(3).  Specifically, the district court

adopted the PSR's finding that Charon

> was a drug dealer and he regularly engaged in laundering
> his criminal proceeds by: opening various checking and/or
> money-marketing accounts and making cash deposits; using
> his wife to open an account in her name, and making
> unexplained cash deposits; asking a third person to
> purchase a cashier's check and purchasing property with
> the cashier's check to disguise the criminal
> proceeds. . . . [Charon's] actions constitute "layering"
> within the meaning of [U.S.S.G.] § 2S1.1.

In deciding whether the district court erred by finding that

Charon's conduct constituted "layering" under § 2S1.1, the

guideline and its commentary guide our analysis.[10]  Section

2S1.1(b)(3) provides that if the offense involved "sophisticated

laundering," the offense level may be increased by two levels.

U.S.S.G. § 2S1.1(b)(3).  The commentary to this section defines

"sophisticated laundering" in part as "complex or intricate

offense conduct" that typically involves the use of, inter alia,

"two or more levels (i.e., layering) of transactions,

transportation, transfers, or transmissions, involving criminally

derived funds that were intended to appear legitimate."  Id.

§ 2S1.1 cmt. n.5(A) & (iii).

---

[10]  "[C]ommentary in the Guidelines Manual that interprets
or explains a guideline is authoritative unless it violates the
Constitution or a federal statute, or is inconsistent with, or a
plainly erroneous reading of, that guideline."  Stinson v. United
States, 508 U.S. 36, 38 (1993).

Charon argues that his conduct is not "complex or intricate" because it involves only two levels of laundering (i.e., giving a third party $20,000 in cash from his drug proceeds, having the third party obtain a cashier's check in the third party's name, and then using that check as a down payment on a piece of property). Moreover, he contends that "layering" does not automatically result in an enhancement for sophisticated laundering under U.S.S.G. § 2S1.1(b)(3) because the guideline's commentary states that sophisticated laundering "<u>typically</u> involves the use of . . . two or more levels (<u>i.e.,</u> layering) . . . ." <u>Id.</u> (emphasis added).

Charon's arguments, however, are contrary to the interpretations provided by the only two circuit courts to address "layering" under § 2S1.1(b)(3): this circuit in <u>United States v. Miles</u>, 360 F.3d 472 (5th Cir. 2004) (holding that the district court did not err in applying § 2S1.1(b)(3)), and the Eighth Circuit in <u>United States v. Pizano</u>, 421 F.3d 707 (8th Cir. 2005) (same), <u>cert. denied</u>, --- S. Ct. ----, 2006 WL 386990, at *1 (U.S. Feb. 21, 2006) (No. 05-8684). In <u>Miles</u>, we held that "[w]hen an individual attempts to launder money through 'two or more levels of transactions,' the commentary <u>clearly subjects</u> an individual to the sophisticated laundering enhancement." 360 F.3d at 482 (emphasis added). Similarly, the Eighth Circuit in <u>Pizano</u> determined that "[u]nder the plain language of § 2S1.1, <u>layering constitutes sophisticated laundering</u>. . . . The

-21-

guideline does not require a finding that each layer was composed of a complex transaction." 421 F.3d at 731 (emphasis added).

When Charon's scheme to conceal or disguise his cocaine trafficking proceeds is viewed in its entirety, we cannot say that the district court clearly erred in finding that Charon's conduct constituted "sophisticated laundering." See id. Accordingly, we affirm the district court's application of U.S.S.G. § 2S1.1(b)(3).

## C.   **Booker Objections**

Finally, Charon makes two arguments under Booker, neither of which deserves extensive treatment given that these arguments are foreclosed by circuit precedent. First, he argues that application of the Booker remedial opinion violates the limitations of ex post facto judicial decision-making that are inherent in the notion of due process. Charon contends that the remedial opinion does not apply retroactively because it was "unexpected and indefensible" under the Supreme Court's holding in Rogers v. Tennessee, 532 U.S. 451, 457 (2001).[11] According to Charon, "both prongs of the test for non-retroactivity [in Rogers] are met, and the Booker remedy cannot be applied to the

---

[11]  In Rogers, the Supreme Court held that "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect." 532 U.S. at 457 (alterations in original) (quoting Bouie v. City of Columbia, 378 U.S. 347, 352 (1964)).

-22-

detriment of a defendant who committed the offense before <u>Booker</u> was decided." See <u>Rogers</u>, 532 U.S. at 457.

Like other circuits addressing this issue, this circuit recently has rejected this argument. In <u>United States v. Austin</u>, 432 F.3d 598 (5th Cir. 2005), we applied our holding in <u>United States v. Scroggins</u>, 411 F.3d 572, 576 (5th Cir. 2005), in rejecting the defendant's ex post facto and due process challenges. In <u>Austin</u>, we stated that

> <u>Scroggins</u> controls here. The fact that [the defendant] was sentenced post-<u>Booker</u>, as distinguished from [the defendant in <u>Scroggins</u>], whose case was on appeal when <u>Booker</u> was decided, does not affect the analysis. At the core of [the defendant's] <u>ex post facto</u> and due process concerns are the "concepts of notice, foreseeability, and the right to fair warning," particularly the claim that a person would have expected sentencing under a mandatory sentencing regime at the time when [the defendant] committed her crime. This anticipation does not depend on the happenstance of when <u>Booker</u> was decided.

432 F.3d at 599 (internal citation omitted) (quoting <u>Rogers</u>, 532 U.S. at 459); <u>see also</u> <u>United States v. Fairclough</u>, --- F.3d ----, 2006 WL 465367, at *2 (2d Cir. Feb. 17, 2006) (concluding that there was no ex post facto problem with the district court's application of the remedial holding of <u>Booker</u> at sentencing because the defendant had fair warning that his conduct was criminal, that enhancements or upward departures could be applied to his sentence, and that he could be sentenced as high as the statutory maximum). In accordance with <u>Austin</u>, we similarly hold that the district court did not violate the limitations of ex post facto that are inherent in the notion of due process by

-23-

applying the remedial holding of Booker at sentencing.

Alternatively, Charon argues that the retroactive application of the Booker remedial opinion directly violates the Ex Post Facto Clause.  Even though he correctly concedes that the Ex Post Facto Clause does not apply to actions by the judiciary, see Rogers, 532 U.S. at 456, he contends that Justice Breyer's remedial opinion in Booker, which established advisory Guidelines, is "an implied legislative change because Booker ruled that this was the remedy Congress would have intended."  We find no merit in Charon's alternative argument, as this court has already rejected a similar challenge in our recent opinion in United States v. Reinhart, --- F.3d ----, 2006 WL 541037, at *6 (5th Cir. Mar. 7, 2006) (concluding that the defendant's argument that the district court's use of advisory Guidelines violates his rights under the Ex Post Facto Clause "is meritless") (citing Rogers, 532 U.S. at 460).

Because Charon does not challenge the reasonableness of his sentence, we need not reach that issue in this appeal. Accordingly, we affirm.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Charon's judgment of conviction and sentence as imposed by the district court.