# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2022

Lyle W. Cayce
Clerk

No. 21-30416

United States of America,

*Plaintiff—Appellee,*

*versus*

Carlos Mario Cantu-Cox,

*Defendant—Appellant,*

consolidated with

No. 21-30419

United States of America,

*Plaintiff—Appellee,*

*versus*

Christopher Cantu-Cox,

*Defendant—Appellant.*

No. 21-30416
Cons. w/ No. 21-30419

---

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:16-CR-162-1 & 2:16-CR-162-2

---

Before CLEMENT, DUNCAN, and WILSON, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

Carlos and Christopher Cantu-Cox pleaded guilty to a federal drug crime. At sentencing, the district court used information regarding a separate kidnapping to enhance the Cantu-Coxes' sentences. The Cantu-Coxes now appeal, arguing that the use of information about the kidnapping is barred by the Sentencing Guidelines. We AFFIRM.

## I

## A

Back in 2016, the Cantu-Coxes ran a methamphetamine operation in Houston. In doing so, the couple distributed methamphetamine to New Orleans. After a months-long investigation, the federal government arrested and charged them with a litany of drug crimes.[1]

After their arrests, the two signed proffer agreements with the government. Per the proffers, the Cantu-Coxes were to "fully disclose any criminal activity of which [they had] knowledge or in which [they had] been involved." They also needed to be "completely truthful during the proffer" and to "make no material misstatements or omissions of fact." In return, the government agreed "not to use any statements made during the proffer . . . at sentencing, or in its case-in-chief in this or any other criminal action brought

---

[1] Those crimes included: conspiracy to distribute methamphetamine; multiple counts of distribution of methamphetamine; multiple counts of attempted distribution of methamphetamine; and multiple counts of possession with intention to distribute methamphetamine.

No. 21-30416
Cons. w/ No. 21-30419

against [the Cantu-Coxes]." Specifically exempted, however, were "crimes of violence": the Cantu-Coxes were under no obligation to disclose information about those crimes, and the government made clear that "all statements made by [the Cantu-Coxes] during the proffer concerning [their] role in crimes of violence may be used against [them]." The proffers kicked off months of fruitful discussion and fruitful arrests of the Cantu-Coxes' drug-dealing colleagues.

**B**

But in November 2017 (roughly a year after the Cantu-Coxes' arrests and their first proffer sessions), the government asked the couple to come back in to discuss a different matter.

Twenty months before, law enforcement had found in a Houston bayou the body of 18-year-old Vincent Stolese. The federal government's investigation led it to William Farris, an associate of the Cantu-Coxes who, in February 2017, informed the government of the couple's role in Stolese's death.

When they came back in, the Cantu-Coxes corroborated Farris' tale and painted a fuller picture of what transpired. Stolese and the Cantu-Coxes had been friends for some time, and the teenager frequently partook in the Cantu-Coxes' wares. But once, while visiting the Cantu-Coxes in Houston in November 2015, Stolese was arrested. The Cantu-Coxes posted some of his bond.

The relationship soured from there. Stolese began missing court appearances, so Texas issued a warrant for his arrest. Stolese's erratic behavior led the Cantu-Coxes to conclude that they faced losing their bond commitment. They decided to avoid that possibility through self-help: offering to give methamphetamine to anyone who helped them find Stolese

and get him back to Texas. Farris, a New Orleans dealer they supplied, answered the call. His ex-girlfriend, Kacie Doucet, was connected to Stolese on Facebook. At Farris' direction, she repeatedly messaged Stolese, inviting him to meet up for sex. He agreed.

It was, of course, a ruse. Doucet recruited yet another friend and, before the two went to meet with Stolese, the Cantu-Coxes provided them with drugs—ketamine and 1,4-butanediol—to slip into Stolese's drinks.

They did so and Stolese eventually passed out. The women handed him off to the Cantu-Coxes, who began the long haul back to Texas. Sometime during that drive, however, the pair realized that Stolese had died. The two drove him to their home to await nightfall. When darkness fell, the Cantu-Coxes drove him to a bridge in Houston and dumped his body in a bayou.

## C

Confessing to the Stolese affair did not end the Cantu-Coxes' cooperation—indeed, the two continued to meet with the government for two more years. That cooperation led them to testify before a grand jury, resulting in the indictment, arrests, and guilty pleas of those involved. In exchange for this cooperation, the government agreed *not* to charge the pair in the affair.

The Cantu-Coxes eventually pleaded guilty to single-count superseding informations charging them with conspiracy to possess and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. The plea was supplemented by a new cooperation agreement as well as promises by the government not to add any additional charges so long as the Cantu-Coxes had truthfully shared details of their previous crimes. The plea agreement made clear that the government

No. 21-30416
Cons. w/ No. 21-30419

"agreed not to bring any other charges . . . from the [defendants']
involvement in a series of events leading to the death of Vincent Stolese,"
but that such promise did "not apply to any *other crimes of violence* that the
[defendants] may have committed."

At sentencing, the district court sentenced both to the statutory
maximum of 240 months, to be followed by five years of supervised release.
In doing so, the court agreed with the government and found that because the
Cantu-Coxes failed to share details of Stolese's death in their original proffer
sessions, they breached their proffer agreement, and so information about the
incident could be considered in sentencing. It also found that Stolese's death
was "relevant conduct" to the Cantu-Coxes' drug conspiracy sufficient to
enhance their sentences. The Cantu-Coxes now appeal (in a consolidated
case).[2]

**II**

We review the district court's application and interpretation of the
Guidelines de novo and its factual findings for clear error. *United States v.
Barfield*, 941 F.3d 757, 761 (5th Cir. 2019). But as to whether the use of
information to enhance a sentence was a violation of a plea or proffer
agreement, our standard of review is "not entirely clear." *United States v.
Ramirez*, 799 F. App'x 293, 294 (5th Cir. 2020) (per curiam) (comparing
*United States v. Charon*, 442 F.3d 881, 889 (5th Cir. 2006) (de novo), with
*United States v. Gibson*, 48 F.3d 876, 878 (5th Cir. 1995) (per curiam) (clear
error)). We need not clarify that standard here, because as we explain, the
Cantu-Coxes' arguments fail under de novo review. *See United States v.*

---

[2] The Cantu-Coxes' plea agreements had waivers of appeal rights. The
government chose not to enforce that waiver.

No. 21-30416
Cons. w/ No. 21-30419

*Rodriguez*, 602 F.3d 346, 361 (5th Cir. 2010) (declining to decide between two standards because the claim fails under the more lenient review standard).

**A**

First, we turn to whether information about the Stolese affair was protected by the proffer.

The Sentencing Guidelines restrict the use in sentencing of information the government only gleaned pursuant to a cooperation agreement. *See* U.S.S.G. § 1B1.8. If the agreement stipulates that information "will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement." *Id.* § 1B1.8(a).

Both defendants had a cooperation agreement with the government, one that traded "full[] disclos[ure of] any criminal activity of which [they had] knowledge or in which [they had] been involved" for a promise to not "use any statements made during the proffer by [the defendants] at sentencing." That promise places the proffer under § 1B1.8 and means the terms of the agreement control the use of information unless one of § 1B1.8's exceptions apply.[3]

---

[3] Below, the government argued—and the district court accepted—that an exception *did* apply: namely, that the Cantu-Coxes *breached* the agreement by failing to disclose the affair during their initial proffer sessions. *See* U.S.S.G. § 1B1.8(b)(4). Now, on appeal, the government argues that the affair was *exempted* from disclosure as a crime of violence. Therefore, says the government, the Cantu-Coxes did not breach the agreement by failing to disclose it, and the government is not barred from using it in sentencing. The Cantu-Coxes argue that we should not consider this new argument. They are right, of course, that the general rule is we "do not ordinarily consider issues that are forfeited because they are raised for the first time on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021). But what the government *says* the proffer means doesn't control—the language of the proffer itself does. The government's shifting interpretation does not change our ability to read the proffer for ourselves.

"Nonprosecution agreements [like proffers or pleas deals] are contractual in nature" and are thus interpreted "in accordance with general principles of contract law." *United States v. Cantu*, 185 F.3d 298, 302 (5th Cir. 1999). When doing so, the court "looks to the language of the contract, unless ambiguous, to determine the intention of the parties." *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013) (quotations and citation omitted). Even if circumstances surrounding the agreement "might indicate the intent of the parties, parol evidence is inadmissible to prove the meaning of an unambiguous [proffer] agreement." *Id.* (quotations and citation omitted). So if the agreement is unambiguous, the court should "not look beyond the four corners of the document." *Id.*

A contract is ambiguous when it "is fairly susceptible to more than one interpretation." *See United States v. Powell*, 574 F. App'x 390, 395 (5th Cir. 2014) (per curiam) (citing *United States v. Harris*, 434 F.3d 767, 770 (5th Cir. 2005)). The court should seek to determine the defendant's "reasonable understanding of the agreement and [construe] ambiguity against the Government." *United States v. Farias*, 469 F.3d 393, 397 (5th Cir. 2006) (quotations and citation omitted).

How the proffer handles information regarding "crimes of violence" is unambiguous. First, the agreement directs:

> **2.    Truthfulness:** Your client acknowledges he must be completely truthful during the proffer and agrees to make no material misstatements or omissions of fact. He understands that he is obligated to fully disclose any criminal activity of which he has knowledge or in which he has been involved.

In the abstract, this provision clearly applies to the Stolese affair: drugging, kidnapping, and then disposing of someone is clearly "criminal activity" the Cantu-Coxes knew of and were involved in.

No. 21-30416
Cons. w/ No. 21-30419

The proffer then states:

> **5. Use of the information provided during the proffer:** The government *agrees not to use any statements made during the proffer by your client at sentencing*, . . . unless such action is for the offense of perjury, false statements, or obstruction of justice based upon statements made during the proffer.

It goes on to clarify:

> **9.    Sentencing Information**: . . . Pursuant to U.S.S.G. § 1B1.8 . . . the proffer may not be used to determine the appropriate guideline sentence, except as stated in the Impeachment paragraph above.

That impeachment paragraph carves out an exception to the use of disclosed information:

> **6. Impeachment:** The government reserves the right to use any statement made by your client during the proffer on cross-examination of him, should he appear as a defendant or witness in any judicial proceeding, and on cross-examination of any witness he may call in any judicial proceeding. The government also reserves the right to use these statements in a rebuttal case against your client regardless of whether he testifies in his own defense.

Read together, then, the Cantu-Coxes had to share any crimes they knew of or participated in, and in exchange, the government wouldn't use that information against them at sentencing (or in a criminal case), except to either impeach them or their witnesses, use in a rebuttal case, or bring separate charges for perjury or obstruction of justice.

But the proffer *also* says:

> **7. Crimes of Violence:** The terms of this agreement *do not apply* to any crimes of violence committed by your client, and *all statements* made by your client during the proffer concerning his role in crimes of violence *may be used against him*.

8

No. 21-30416
Cons. w/ No. 21-30419

This paragraph leaves no doubt that the proffer's terms (including the requirement to be truthful, the promise of use immunity, and the carve-out for impeachment) *are not applicable to crimes of violence.* They are wholly exempted from the proffer's general scheme (*i.e.*, tell the truth and we won't use it against you except to prove you're lying). No other requirement of the proffer, *for either party*, applies to information about a crime of violence.

The Cantu-Coxes suggest a different reading. They say that paragraph 9 makes explicit that the *only* way *anything* can be used against them in sentencing is pursuant to the impeachment paragraph. According to them, then, the crimes of violence exception "*does not apply* to the determination of the appropriate sentencing guideline, but that the impeachment exception does."

We find that reading unreasonable. The crime-of-violence paragraph explicitly exempts it from *any* other requirement in the proffer. While the impeachment paragraph is an *exception* to the promise not to use information against the Cantu-Coxes, so is the crimes-of-violence paragraph. It explains that *anything* that they say regarding a crime of violence can be used against them. The Cantu-Coxes' reading instead exempts crimes-of-violence information from *some* terms but not others. Implicitly, they suggest that crimes of violence are exempted from the requirement of disclosure and from the promise to not bring future charges, but *not* from the promise to not use the information in sentencing. The Cantu-Coxes do not explain why the provisions should be inconsistently applied, especially when the paragraph itself makes clear that *no* other term applies to that sort of information.

The proffer is clear: information about crimes of violence can be used against the Cantu-Coxes. So, does information about the Stolese affair concern a "crime of violence"? Indeed, it does.

9

No. 21-30416
Cons. w/ No. 21-30419

"Crime of violence" is not defined in the proffer. But "whether the language is contractual, as here, or statutory, we give words their ordinary, natural meaning." *Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 (5th Cir. 2019). It is painfully obvious that kidnapping someone is a crime. Here, it is also a violent one. In ordinary parlance, "violence" means the "deliberate exercise of physical force against a person." *Violence*, OXFORD ENGLISH DICTIONARY (2014). Stolese's kidnapping fits the bill: the Cantu-Coxes orchestrated Stolese's fatal drugging, whereby his body was loaded into a car, driven across state lines, and then thrown off a bridge. It is difficult to imagine how one could drug and kidnap another without physical force. Therefore, under the natural meaning of the phrase, Stolese's kidnapping was a crime of violence.[4]

In sum, the proffer is clear: statements regarding crimes of violence can be used against the Cantu-Coxes. And the Stolese affair involved a crime of violence. Thus, its use in sentencing was not barred by the proffer, and so the district court did not err in considering it.

**B**

Because we conclude that the information regarding the Stolese affair was not protected by the proffer, we must determine whether it involves "relevant conduct."

---

[4] The government also briefly discusses a prior case where we concluded that kidnapping that results in death (as here) was a crime of violence allowing sentencing enhancement under 18 U.S.C. § 924(c). *See generally In re Hall*, 979 F.3d 339 (5th Cir. 2020). Notwithstanding the shaky foundation *In re Hall* stands on after *Borden v. United States*, 141 S. Ct. 1817 (2021), there is no indication that the parties intended "crime of violence" in the proffer to import the statutory term of art, complete with its categorical-approach baggage. We decline to import it ourselves, even if doing so would further underline our conclusion here.

No. 21-30416
Cons. w/ No. 21-30419

When calculating the appropriate guideline range, the district court may consider acts outside those underlying the offense of conviction only when those acts constitute "relevant conduct." U.S.S.G. § 1B1.3. The district court's determination of relevant conduct is a factual finding reviewed for clear error. *Barfield*, 941 F.3d at 761. This court should only overturn the district court's factual findings "if a review of all the evidence leaves [it] with the definite and firm conviction that a mistake has been committed." *Id.* at 761–62 (quotations and citation omitted). If instead, the finding is plausible considering the record, it is not clearly erroneous. *Id.* What matters, at base, is that "[c]ourts are to consider more than the offense of conviction itself in fitting the sentence to the crime and the criminal." *United States v. Levario-Quiroz*, 161 F.3d 903, 906 (5th Cir. 1998).

The Guidelines "provide[] different definitions of relevant conduct based on the defendant's offense of conviction." *United States v. Deckert*, 993 F.3d 399, 401 (5th Cir. 2021). Several different provisions are at play here.

*First*, relevant conduct includes any act "committed, . . . commanded, induced, procured, or willfully caused by the defendant" "during the commission of the offense of conviction," or "in preparation for that offense . . . ." U.S.S.G. § 1B1.3(a)(1)(A).[5] *Second*, with respect to any "jointly undertaken criminal activity" relevant conduct includes any act "of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in

---

[5] The second half of this definition (and of § 1B1.3(a)(1)(B))—"that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"—is what is often called the "trailing clause" of subsection (a)(1). *Deckert*, 993 F.3d at 402. It is not directly a part of either (a)(1)(A)'s or (a)(1)(B)'s text but has been held to be incorporated into both. *Id.* The trailing clause is *not* incorporated, however, into the requirements of § 1B1.3(a)(2). *Id.* at 404.

11

connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense . . . ." *Id.* § 1B1.3(a)(1)(B). *Third*, with respect to groupable offenses under § 3D1.2(d), relevant conduct includes "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" *Id.* § 1B1.3(a)(2). Section 3D1.2(d) requires grouping of "[a]ll counts involving substantially the same harm . . . [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, . . . ."

Regardless of which definition applies, "all harm that resulted from the acts and omissions . . . and all harm that was the object of such acts and omissions" is considered relevant. *Id.* § 1B1.3(a)(3).

As noted, the Cantu-Coxes pleaded guilty to a single count of conspiring to possess and distribute a quantity of methamphetamine.[6] The base offense level for that crime is set by U.S.S.G. § 2D1.1. Section 2D1.1, a groupable offense, includes a cross reference provision. That provision directs that "[i]f a victim was killed under circumstances that would constitute murder . . . , apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate" if that results in a greater offense level than under § 2D1.1 itself. *Id.* § 2D1.1(d)(1).

In calculating the Cantu-Coxes' guideline range, the district court first determined that because they "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" the Stolese affair, it constituted relevant conduct under section (a)(1)(A). It also found that

---

[6] It bears repeating that the facts of this case are not in dispute. The court adopted the undisputed findings of the factual basis.

because it was "is in furtherance of the jointly undertaken criminal activity," (seemingly under section (a)(1)(B)(ii), though that was not made explicit), it also constituted relevant conduct. The court noted that the Stolese affair occurred during the same time period as the drug conspiracy, and involved the same drug (*i.e.*, methamphetamine, which the Cantu-Coxes used to pay their co-conspirators for their help). All told, the district court concluded it could consider the Stolese affair, which then invoked the cross-reference provision in § 2D1.1 and set the appropriate offense level pursuant to § 2A1.1 (first degree murder)—ending at a calculation of 43.

Our stage is now set. The Cantu-Coxes argue that the court erred in considering the Stolese affair relevant conduct to their drug conspiracy. First, they argue that the court applied an erroneous understanding of § 1B1.3(a), conflating the two definitions under section (a)(1) and failing to make the requisite factual findings under either. They claim the court merely found that they committed and induced the event (per section (a)(1)(A)) and that it was in furtherance of their conspiracy (per section (a)(1)(B)(ii)), but made no finding about the other prongs of section (a)(1)(B) or any finding that the affair "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

We need not address those arguments, however, because the Stolese affair is properly considered relevant conduct under section (a)(2). *See United States v. Hankton*, 875 F.3d 786, 793 (5th Cir. 2017) (noting that the court, in its discretion, can affirm on an alternative basis supported by the record). As mentioned, relevant conduct under section (a)(2) includes "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" That "includes acts that were part of the common drug-

trafficking scheme." *Deckert*, 993 F.3d at 404. "Conduct is part of a common scheme or plan if it is substantially connected to the offense of conviction by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id.* (alterations adopted) (quotations and citation omitted). And in drug cases, "this circuit has broadly defined what constitutes 'the same course of conduct' or 'common scheme or plan.'" *Barfield*, 941 F.3d at 763 (citation omitted).

The Cantu-Coxes clearly committed, induced, and counseled on the exchange of methamphetamine for Stolese's kidnapping and return. *See* § 1B1.3(a)(1)(A). We must decide, then, if doing so was "part of the same course of conduct or common scheme or plan as the offense of conviction." We hold that it is.

First, the two overlap in time. The Cantu-Coxes' factual basis indicates that their drug conspiracy ran from sometime before January 1, 2016, until at least August 2016. The Stolese affair occurred during February of that year. Next, the two share a common accomplice. Farris was a New Orleans drug dealer supplied by the Cantu-Coxes during their conspiracy. They again supplied him with methamphetamine in payment for his help capturing Stolese.[7] Thus, the Cantu-Coxes possessed methamphetamine (just like their offense of conviction), offered it in personal quantities to a dealer in New Orleans they'd previously supplied (just like their offense of conviction), and distributed it to that dealer in exchange for payment— Stolese himself—(just like their offense of conviction).

---

[7] The Cantu-Coxes argue that Farris was not an indicted co-conspirator to their conspiracy, and so was not a common accomplice. But the district court nevertheless found (by adopting the Cantu-Coxes' signed factual basis) that they were Farris' methamphetamine supplier. Just because Farris was never indicted does not mean he was not, factually, a common accomplice.

Nothing the Cantu-Coxes cite convinces us otherwise. They point to *United States v. Wall*, 180 F.3d 641 (5th Cir. 1999), for the proposition that using a drug as a personal currency is not relevant conduct to distribution. *Wall* involved nothing of the sort. Instead, *Wall* concludes that a drug crime, occurring *five years* after the offense of conviction, and lacking a common supplier, destination, or modus operandi, could not be considered relevant conduct. *Id.* at 645–46. The only thing the two offenses had in common, said the court, was that they involved marijuana. *Id.* at 646. Here, however, the drug is the same, the destination (either New Orleans generally or Farris specifically) is the same, and the general modus operandi is the same. *See also United States v. Rhine*, 583 F.3d 878 (5th Cir. 2009) (finding dissimilar a large-scale distribution ring from possession with intent to distribute a small amount of cocaine when the two acts—unlike here—did not share a common accomplice or timeline).

Similarly distinguishable are the Cantu-Coxes' cases indicating *possession* of a drug is not necessarily relevant conduct to *distribution*. *See, e.g.*, *Jansen v. United States*, 369 F.3d 237, 247 (3d Cir. 2004); *United States v. Williams*, 247 F.3d 353, 358 (2d Cir. 2001). The Cantu-Coxes did not merely possess methamphetamine here. They distributed it to Farris in return for help in drugging and kidnapping Stolese.

The Cantu-Coxes also argue that their objective in the Stolese affair—to get Stolese back to Texas to turn him in to the authorities—differed from the objective of their methamphetamine conspiracy. But a common purpose is only one factor courts consider. That the two differed in their ultimate objective is not fatal to a finding of relevant conduct. *See United States v. Bethley*, 973 F.2d 396, 401 (5th Cir. 1992).

They further argue that giving methamphetamine to Farris was *harmful* to their conspiracy because it removed from their possession meth

they would have otherwise distributed. But the methamphetamine left their possession because they *distributed* it to Farris. The actual conduct is the same: they had methamphetamine in their possession and gave it to someone else in return for something of value (either money, or Stolese).

All told, we conclude the Stolese affair involved conduct induced and committed by the Cantu-Coxes as part of their common drug-trafficking scheme. The harm that resulted from that conduct—Stolese's death—was properly considered relevant by the district court. *See* § 1B1.3(a)(3).[8]

### III

The Cantu-Coxes' sentences are AFFIRMED.

---

[8] The Cantu-Coxes argue that murder cannot be considered a "groupable" offense." That is true, but the Cantu-Coxes' distribution of methamphetamine to Farris—and any attendant harm from that distribution—*is* groupable.