# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2023

Lyle W. Cayce
Clerk

No. 21-11273

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

LEAH HAGEN,

*Defendant—Appellant*,

CONSOLIDATED WITH

No. 21-11279

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MICHAEL HAGEN,

*Defendant—Appellant*.

No. 21-11273
c/w No. 21- 11279

---

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-146-1
USDC No. 3:19-CR-146-2

---

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

Leah and Michael Hagen were convicted by a jury of conspiring to defraud the United States and to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1), (b)(2), and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A), (h). The district court sentenced each defendant to 151 months of imprisonment to be followed by three years of supervised release and ordered the defendants to pay, jointly and severally, $27,104,359 in restitution. The Hagens now appeal, arguing that the district court erred in excluding certain evidence, refusing to instruct the jury about an affirmative defense, imposing a sentencing enhancement for sophisticated money laundering, and ordering restitution. For the reasons stated below, we AFFIRM the Hagens' convictions and sentences.

I.

A.

Medicare Part B is a federal healthcare program that provides durable medical equipment ("DME") like wheelchairs, walkers, and braces to qualifying individuals, among other benefits. Medicare Part C, which is administered by private health insurance companies, also covers DME for beneficiaries.

A beneficiary of Medicare Parts B or C needs a doctor's order to obtain covered equipment. To write such an order, Medicare requires that

No. 21-11273
c/w No. 21- 11279

the doctor have treated or examined the patient. But when a patient lives in a rural area where there is limited access to medical care, Medicare accepts an electronic "telehealth" meeting between the doctor and patient as a substitute. Still, telehealth appointments must include real time audio and visual communication and patients must go to a medical facility like a doctor's office or hospital for telehealth calls.

After a patient gets a doctor's order, an equipment supply company fills it. Then, the supplier submits a claim to Medicare for the equipment. A claim is only eligible for payment under Part B if the supplier is enrolled in Medicare.

To enroll in Medicare, a supplier must agree to comply with pertinent laws and regulations, including the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. That statute "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). Medicare does not reimburse claims that are based on prohibited kickbacks.

The Hagens are a married couple that owned and operated two DME supply companies, Metro DME Supply ("Metro DME") and Ortho Pain Solutions ("OPS").

In 2006, the Hagens enrolled Metro DME as a provider under Medicare Part B. On February 7, 2013, the Hagens applied to recertify Metro DME as a Part B provider. In that application, the Hagens stated that they would comply with the AKS. The Hagens recertified that statement in 2016 and 2017. But the Hagens terminated Metro DME's Part B certification on September 30, 2017.

3

No. 21-11273
c/w No. 21- 11279

At trial, the Hagens testified that they founded OPS in 2014 to sell wholesale braces to doctors. As discussed below, the Hagens used OPS to bill private insurers for equipment through Medicare Part C.

B.

Between March 2016 and January 2019, almost all the Hagens' business was generated through two companies called Chronos Strategies HLK Corp. ("Chronos") and Pantheon Concepts HLK Co. ("Pantheon"). Herb Kimble owned those companies with his wife, Claire Reyes Kimble, and operated them out of the Philippines. Chronos and Pantheon purported to offer marketing and business process outsourcing ("BPO") services to the Hagens.

Kimble testified that the Hagens visited him in the Philippines in 2017 and 2018. During those trips, the Hagens visited Kimble's call center and observed his operations.

To help the Hagens get equipment orders, Kimble's companies ran advertisements targeting senior citizens who had pain or discomfort. Those advertisements directed targets to contact a call center, also operated by Kimble, where an "opener" would make sure the target was Medicare eligible. Next, the call would be transferred to a "closer" to confirm the caller's eligibility and upsell the caller on additional braces. The closer would then transfer the caller to a telemedicine doctor who would sign an equipment order. Kimble's companies would upload the order to an online portal where the Hagens' DME companies could access them to bill Medicare.

More than eighty percent of Kimble's callers were told they needed two or more braces. And almost seventy percent were persuaded to get what

No. 21-11273
c/w No. 21- 11279

Kimble called an "iron man package," meaning three or more braces—for example, shoulder, back, knee, and wrist braces.

At trial, Kimble testified that he was introduced to the Hagens on a phone call in March 2016.[1] During the call, the Hagens allegedly told Kimble that they had been unhappy with a prior marketing deal where they paid for leads on doctors' orders. Those leads often did not result in completed orders. So Kimble proposed that he would sell the Hagens completed orders that they could immediately fill and submit to Medicare for reimbursement. Under this arrangement, the Hagens would prepay Kimble for a certain number of brace orders at a set price per order and "get a guaranteed result." The Hagens agreed to give it a shot. According to Kimble, the Hagens negotiated prices for different types of brace orders over email and signed contracts with Chronos and Pantheon.

An email exchange shortly after the Hagens signed the contracts supports Kimble's story. Leah emailed that Metro DME wanted to fill back brace orders. Claire Kimble answered at Herb's direction. Since Kimble's companies would not be able to "monetize" all "inbound leads and calls" "with just [b]ack [b]race" orders, they would charge at least $375 per back brace order. Michael responded, "[t]his is not what was agreed upon. I made notes during the first call with Herb and there was no mention of strings attached." He also seemed to complain that Claire had mentioned the alleged kickback scheme in writing: "[W]hy are you emailing about this?? We are NOT paying per referral! This is not a good start!" But Leah also emailed back, "[l]et's start with [ten] back and [five] wrist if we can please."

---

[1] Kimble testified that this call was in March 2015. Despite Kimble's testimony, the government asserts that the call happened in March 2016. Given the timing of subsequent emails in the record, Kimble likely misspoke.

No. 21-11273
c/w No. 21- 11279

Other evidence was consistent with Kimble's account of the deal. Leah's emails and Skype messages to Kimble's companies often referred to specific quantities of orders. When the Hagens missed a payment, Kimble did not send them orders. And when an order did not result in payment by Medicare, the Hagens asked for replacement orders, which they called "credits."

As a result of the deal with Kimble, the Hagens' business grew exponentially. In 2015, Metro DME billed between 100 and 200 claims, and in 2016, it billed over 6,000 claims. From January 2015 to February 2016, Metro DME received $135,000 from Medicare. In January 2017 alone, Metro DME cleared about $1 million in Medicare payouts. OPS had similar returns in 2018. Meanwhile, the geographic scope of the Hagens' business expanded from the Dallas area to nationwide.

To cover up the scheme, Kimble testified that the Hagens signed contracts for legitimate business services. Marketing contracts between Metro DME and Pantheon and OPS and Chronos said that Kimble's companies would provide the Hagens' companies with "[r]aw [l]eads" on potential customers. Those contracts explained that raw leads were "not referrals" or guaranteed customers. BPO contracts between Metro DME and Chronos and OPS and Pantheon required the Hagens' companies to pay Kimble's companies on an hourly basis, and Kimble's companies would "submit properly documented invoices . . . on a weekly basis for the [s]ervices performed the previous week." Those services included handling inbound calls and making outbound calls to potential customers. All the contracts said that the parties would comply with the AKS. And Kimble testified that in case of an audit, Kimble or the Hagens could point to the contracts to prove that they were not paying for doctors' orders.

No. 21-11273
c/w No. 21- 11279

Consistent with those contracts, Kimble's companies billed the Hagens for marketing and BPO services. But Kimble testified that the invoices were used to disguise the scheme. Each week, the total amount owed for doctors' orders would be divided into 75 and 25 percent portions and invoiced as a marketing fee and hourly BPO fee, respectively.

Despite the guise of separate marketing and BPO fees, Kimble's companies started charging a "standardized brace cost of $280 per brace" in September 2016. From that point on, the Hagens wired Kimble's companies weekly payments in amounts divisible by $280.

The Hagens tried to shield their employees from the scheme. Employees of the Hagens testified that Kimble's companies sent doctors' orders, medical records, and recordings of patient conversations to the Hagens' office. But the Hagens did not permit those employees to communicate with Kimble's companies or to listen to the recordings.

Between March 2016 and January 2019, the Hagens' companies billed Medicare Part B and Medicare Part C insurers almost $59,976,900. They were paid about $27 million, around $15 million of which was wired to Kimble's companies. Those wires were sent in pairs, to Chronos and Pantheon in the Philippines. The Hagens also wired $5 million of their gains to their overseas accounts. They used some of that money to renovate a home in Spain.

However, Medicare took note of the Hagens' unusual billing activity. Medicare denied claims because braces were not medically necessary, not enough time had elapsed since the patient had received the same brace, or the patient had passed away. One denial letter said that the doctor ordered so much equipment for the patient that the patient would be a "walking mummy." Sometimes, Medicare denied hundreds of the Hagens' claims at once.

No. 21-11273
c/w No. 21- 11279

In August 2017, a Medicare contractor suspended payments to Metro DME.  The Hagens terminated Metro DME's Medicare Part B enrollment at the end of September 2017. Kimble testified that he advised the Hagens to start billing private insurers through Medicare Part C, and they did so with OPS.  Those insurance companies denied OPS's claims almost every day. Humana audited OPS, and Aetna stopped payments to OPS altogether.

At trial, the Hagens told a different story. Leah testified that Kimble did not explain the scheme in their first call.  To the contrary, Leah testified that Kimble only described the marketing, advertising, and BPO services that he could provide.  Leah said she thought those services were legitimate and asserted that the Hagens never had access to Kimble's internal operations, including telehealth doctors or doctor-patient consultations.   Michael confirmed that they never entered into an agreement to buy doctors' orders from Kimble.

Instead, both Leah and Michael testified that Kimble told them about a formula that allowed him to calculate the likely number of doctors' orders produced by a given number of leads.  They would give Kimble a target number of doctors' orders, and Kimble would estimate how many raw leads they needed to buy to meet the target.  The Hagens prepaid for leads, but doctors' orders were not guaranteed.  Kimble's $280 cost per brace represented internal advertising costs and nothing more.  As to credits that the Hagens demanded from Kimble, Michael testified the Hagens were merely asking for invalid or duplicate leads to be regenerated.

In addition, Leah testified that Kimble never told them that the contracts were a sham to disguise their illegal scheme.  She maintained that they had agreed to pay $8 per hour for BPO services and $7.50 per raw lead. Yet Michael testified that they never saw any raw leads.  Michael also testified that Kimble told him that the contracts had been "vetted" and

8

No. 21-11273
c/w No. 21- 11279

"reviewed" by attorneys.  But the Hagens did not have their own attorneys review the contracts.

The jury also heard evidence that Kimble said the Hagens were clueless about the scheme.  On cross-examination, defense counsel refreshed Kimble's recollection with a report from an interview with a government agent on December 5, 2018.  Kimble admitted that he told the agent that the Hagens believed "[t]hat the system they were operating in" was "[l]egal." On redirect, Kimble clarified that he did not write the interview report and did not know the context for the statement in the report.

## C.

The Hagens were charged in a two-count superseding indictment. The first count alleged that the Hagens conspired to defraud the United States and to pay and receive healthcare kickbacks, *see* 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(1), (b)(2), and the second count alleged that they conspired to commit money laundering, *see* 18 U.S.C. § 1956(a)(2)(A), (h).

After an eight-day trial, the jury found Leah and Michael Hagen guilty on both counts.  The Hagens filed a joint motion for a new trial, which the district court denied.

The district court sentenced each defendant to 151 months of imprisonment to be followed by three years of supervised release and ordered the defendants to pay, jointly and severally, $27,104,359 in restitution.

The Hagens have timely appealed.

## II.

The Hagens first challenge the district court's decision to exclude the testimony of an attorney, Joshua Skora, with whom Kimble consulted.  This testimony was not relevant and was cumulative with testimony elicited on

No. 21-11273
c/w No. 21- 11279

Kimble's cross-examination. Accordingly, the district court did not abuse its discretion in excluding it.[2]

A.

Where a defendant preserves an objection to the exclusion of evidence, we review the district court's ruling for an abuse of discretion and harmless error. *United States v. Njoku*, 737 F.3d 55, 73 (5th Cir. 2013); *United States v. Saldana*, 427 F.3d 298, 306 (5th Cir. 2005). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Portillo*, 969 F.3d 144, 168 (5th Cir. 2020). But a district court "has the power to exclude . . . witness testimony that would be cumulative and marginally relevant." *United States v. Alaniz*, 726 F.3d 586, 606 (5th Cir. 2013) (citation omitted). We give the trial court "wide discretion in assessing the relevance and prejudicial effect of evidence." *Id.* (citation omitted); *see United States v. Gonzalez-Lira*, 936 F.2d 184, 191 (5th Cir. 1991) (trial judge's balancing of probative value and prejudicial effect given "great deference on review").

An error in excluding evidence is harmless "unless it affected the defendant's substantial rights." *United States v. Johnson*, 880 F.3d 226, 231 (5th Cir. 2018) (citation omitted). The question of for us is whether, "consider[ing] the other evidence in the case[,] . . . the improperly excluded evidence, if admitted, would have had a substantial impact on the jury's verdict." *Id.* (citation omitted).

---

[2] The Hagens also argue that the district court erred in excluding documentary evidence of Kimble's communications with his attorneys. For similar reasons as concern Skora's testimony, *see infra* Section II.C, any error in excluding these documents was harmless.

No. 21-11273
c/w No. 21- 11279

B.

In the Hagens' pretrial witness and exhibit lists, they named four of Kimble's attorneys, including Skora, and included hundreds of documents pertaining to Kimble's communications with his legal team. The government moved in limine to exclude those witnesses and evidence on notice and relevance grounds. The district court denied that motion, permitting the Hagens "to call as witnesses four former attorneys of . . . Kimble and to present evidence of Kimble's attorney-client communications, if admissible."

At trial, the defense tried to cross-examine Kimble about whether he told the Hagens that his "operations were . . . vetted by healthcare and regulatory lawyers." The government objected. "[I]n abundance of caution," the district court let the defense ask Kimble whether law firms created the contracts so long as the defense also asked Kimble whether he told the Hagens that the contracts had been vetted. The court permitted the defense to show certain emails to Kimble but sustained the government's objection to admitting those emails on hearsay grounds.

On cross-examination, Kimble testified that templates for the Hagens' contracts had been prepared by an attorney at King & Spalding. Kimble also testified that he consulted with lawyers at K&L Gates. However, Kimble said that he did not share his communications with those firms with the Hagens. The defense then cross-examined Kimble about the meaning of different terms and provisions in the contracts between Kimble's and the Hagens' companies.

After the cross-examination, the Hagens submitted a trial brief arguing that defendants' proposed exhibits 147-238, 247, 258-330, 349-68, 370, 374-76, and 383-88 should be admitted. At a bench conference, the defense argued that the evidence was relevant because it showed that Kimble

explained his business to his lawyers in the same way that the Hagens claimed he explained it to them. The government responded that the evidence was hearsay, confusing, misleading, and irrelevant. The district court excluded the documentary evidence on hearsay and relevance grounds but permitted the defense to recall Kimble and ask him about his communications with his lawyers.

The defense chose not to recall Kimble, and instead made a proffer of Skora's testimony outside the presence of the jury. Skora testified that Kimble was a former client who had retained K&L Gates to provide regulatory compliance advice for Chronos and Pantheon with respect to "prospective activities that the companies wanted to do with third-party companies." To help "get[] to know a new client," Skora reviewed marketing and BPO service agreements dated October 11, 2017, between Kimble's companies and a third-party company called Rego Medical. Kimble never told Skora that Kimble sold doctors' orders to clients, and Skora's impression was that Kimble's prospective activities with third parties would be in compliance with federal law.

The district court excluded Skora's testimony. The government did not dispute and the court accepted that the Rego Medical contracts were identical to those entered into by the Hagens' companies, but the court would not permit Skora to testify. The court explained that if Skora's testimony concerned the contracts between Kimble and the Hagens, Skora's testimony might be admissible. And the court stated that if the defense could call a lawyer who had reviewed the two contracts at issue in the Hagens' case, then the court would entertain the admissibility of such a witness. The Hagens did not call such a lawyer as a witness.

After the jury returned a verdict, the Hagens moved for a new trial based on the district court's exclusion of Skora's testimony and the

No. 21-11273
c/w No. 21- 11279

documentary evidence of Kimble's attorney-client communications. The district court denied the motion.

The district court rejected the Hagens' argument that Skora's testimony "would have bolstered their position that Kimble misled them by concealing the illegal nature of his operation." The fact that Skora never heard Kimble mention the sale of doctors' orders was not "key exculpatory information," as the defense suggested. Rather, Kimble hired Skora after the Hagens signed their contracts with Kimble, rendering Skora's testimony irrelevant to the contracts at issue in the case. And the district court noted that the Hagens elicited similar testimony from Kimble on cross-examination.

For the same reasons, the district court concluded that the documentary evidence was inadmissible. The district court also explained that the Hagens did not identify "any specific document . . . that would have impacted the jury's verdict" or how the documents would have impacted the verdict.

## C.

The district court did not abuse its discretion in excluding Skora's testimony because the proffered testimony was irrelevant and needlessly cumulative. In any event, exclusion of Skora's testimony was harmless error in light of the other evidence in the case.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401; *see United States v. Jones*, 664 F.3d 966, 975 (5th Cir. 2011) ("Evidence is relevant if it tends to prove the point . . . for which it is

13

No. 21-11273
c/w No. 21- 11279

offered . . . and if the point . . . counts in the case." (citation omitted)). "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

The Hagens' theory is that Skora's testimony makes it more likely that they believed they were buying legitimate marketing and BPO services from Kimble, not doctors' orders. And if that were true, the Hagens may have lacked the necessary criminal intent to act "with bad purpose either to disobey or disregard the law," *United States v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019) (citation omitted), for the government to prove a conspiracy to violate the AKS, *see United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017); *Njoku*, 737 F.3d at 64.[3]

But the fact that Kimble did not tell Skora that he sold doctors' orders to suppliers does not have "any tendency to make [it] more or less probable" that Kimble also did not tell the Hagens that he was selling them doctors'

---

[3] In relevant part, the Anti–Kickback Statute, 42 U.S.C. § 1320a-7b(b), "is violated when a defendant knowingly and willfully gives or receives a benefit for referring a party to a health care provider for services paid for by a federal health care program." *Sanjar*, 876 F.3d at 746. The government must prove beyond a reasonable doubt that the defendant "(1) solicited or received renumeration, (2) in return for referring an individual for a service, (3) that may be paid under a federal health care program, and (4) that the defendant acted knowingly and willfully." *Ricard*, 922 F.3d at 647.

To obtain a conviction for a conspiracy to violate the AKS, the government must prove an agreement to violate that law, knowing and voluntary participation in the conspiracy, and an overt act by one member of the conspiracy in furtherance of the unlawful goal. *Id.*; *Njoku*, 737 F.3d at 64 (citation omitted). "The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001) (citation omitted). Thus, the government has to prove that a defendant intended to further an unlawful objective and acted willfully, "with the specific intent to do something the law forbids," *Njoku*, 737 F.3d at 64 (citation omitted), meaning a "bad purpose either to disobey or disregard the law," *Ricard*, 922 F.3d at 648 (citation omitted). But a defendant need not be aware of the specific law that the defendant is charged with violating. *United States v. Nora*, 988 F.3d 823, 830 n.3 (5th Cir. 2021).

14

orders, or that the Hagens did not know about the true nature of their relationship. *See* FED R. EVID. 401(a). That Kimble kept a secret from an attorney retained to analyze one business partner does not have any bearing on whether Kimble kept the same secret from a different business partner. Indeed, the Hagens had nothing to do with Skora's engagement. Skora reviewed contracts that Kimble signed with a separate third party. He did not testify that Kimble asked him to review the Hagens' contracts or the arrangement that Kimble had struck with them. And Kimble engaged Skora more than a year after the alleged scheme had begun, after the Hagens had signed all their contracts.

While the Hagens argue that "the point of the testimony" was "to show how Kimble misled both healthcare attorneys and the Hagens about the nature of the operation," it does not follow that Kimble would have disclosed his deal with the Hagens in an unrelated conversation about a different company. Even assuming Kimble had the same deal with Rego Medical that he did with the Hagens, there is no reason why Kimble would have asked Skora to review the illegal aspects of his operations. After all, the purpose of the marketing and BPO services contracts was to give Kimble's operation a veneer of legitimacy.

Construed liberally, the Hagens' argument is that because a healthcare attorney could not discern an undisclosed, illegitimate part of Kimble's business from the contracts, it is more likely that a DME supplier given the same information would also be unaware of the hidden kickback scheme. But this argument rests on an unsubstantiated premise that Skora was given the same information as the Hagens, even though he consulted with Kimble about a different third-party company long after Kimble and the Hagens started doing business, and even though Kimble retained Skora for compliance advice. The district court did not abuse its discretion in deciding

that this lawyers-to-partners comparison is too remote and speculative to make the Hagens' innocent state of mind more probable.[4]

True, the contracts that Skora reviewed were the same as those that the Hagens signed. This would tend to make it more likely that the Hagens' contracts were legitimate, since Skora concluded that Kimble's prospective contracts with Rego Medical would be legitimate. But the legitimacy of the Hagens' contracts was not a disputed fact at trial. Kimble testified that the purpose of the contracts was to cover up the kickback scheme. The contracts needed to be legitimate so that if Kimble or the Hagens were audited, nothing would appear to be amiss. And the case turned on whether those contracts accurately represented Kimble's business with the Hagens. In other words, the fact that the Hagens' contracts were approved by a lawyer is irrelevant to whether those contracts accurately represented the Hagens' dealings with Kimble.

Even if Skora's testimony had some relevance to the Hagens' scienter, the district court did not take a clearly erroneous view of the evidence in finding its probative value "substantially outweighed by a danger of . . . needlessly presenting cumulative evidence" under Rule 403. FED. R. EVID. 403. The district court permitted the defense to elicit compelling testimony from Kimble on cross-examination. Kimble testified that his attorney at King & Spalding, Seth Lundy, prepared the template contracts

---

[4] The Hagens also argue that Skora's testimony would have shown that the way Kimble talked about "his business operation to outside parties was inconsistent with the way he described his business operation at trial." But Skora is not the same kind of outside party as the Hagens: he was a lawyer retained to evaluate the contracts for regulatory compliance, not a business partner being brought in on the deal. So Skora's "point of view with respect to Kimble's operation" was not the same as the Hagens', and Kimble did not "deceive[] a knowledgeable and experienced healthcare attorney in a similar way" to the Hagens.

that the Hagens signed.  The defense then cross-examined Kimble about how he later sought advice from K&L Gates about the templates.  It was unnecessary to call Skora to corroborate Kimble's testimony that K&L Gates had reviewed those contracts.  And since Kimble testified that the specific contracts that the Hagens used had been generated by his legal team, it would have been needlessly cumulative to offer testimony from a different lawyer confirming that those contracts, used in the context of a separate business relationship, were legitimate.

The Hagens rely on *United States v. Lowery*, but that case is inapposite. 135 F.3d 957 (5th Cir. 1998) (per curiam).  There, the government indicted and tried the owner of a gentleman's club for obstruction of justice in connection with an earlier trial of the owner's girlfriend for tax evasion.  *Id.* at 958-59.  The defendant argued as an affirmative defense that he had merely tried to encourage one of his employees and the employee's son to tell the truth at the girlfriend's trial.  *Id.* at 959.  The district court excluded evidence from the tax-evasion trial on the ground that it was irrelevant.  *Id.* Our court reversed, finding that the exclusion of "evidence from and with reference to the . . . trial" was harmful error because the defendant could not develop his affirmative defense without eliciting testimony about the government's conduct in the trial—evidence that the district court's order excluded.  *Id.* at 959-60.  In effect, the district court "left [the defendant] little more than the ability to make unsubstantiated and . . . unprovable claims on the witness stand."  *Id.* at 960.

This case is different from *Lowery*.  Skora's testimony would not have allowed the Hagens to argue that they were ignorant about the scope of Kimble's operation, which was the lynchpin of their defense.  Instead, Skora's analysis of Kimble's later arrangement with an unrelated third-party would have only made it more likely that the Hagens' contracts were legal—

17

not that those contracts represented the extent of their deal. And the district court did not restrict all references to the legitimacy of the contracts. Rather, the district court permitted the defense to cross-examine Kimble about whether lawyers had vetted the contracts. And based on the resulting cross-examination, the defense argued at closing that the "contracts were vetted and prepared . . . by healthcare regulatory attorneys . . . at the international law firm of King & Spalding." The Hagens' claims that they believed the contracts to be legitimate were not left unsubstantiated and unprovable by the district court's evidentiary ruling.[5]

Regardless, any error by the district court in excluding Skora's testimony did not have a substantial impact on the jury's verdict. *See Johnson*, 880 F.3d at 231. Even if Skora's testimony made it more likely that Kimble misled the Hagens, ample evidence supported Kimble's testimony that the Hagens knew they were purchasing doctors' orders. The Hagens objected to Kimble's wife mentioning referrals over email, requested specific quantities of doctors' orders, did not receive orders when they failed to pay Kimble, and asked for orders to be credited to their account when Medicare

---

[5] *United States v. Garber* proves the point. 607 F.2d 92 (5th Cir. 1979). In *Garber*, a defendant charged with tax evasion for not paying income taxes on money she received for donating blood plasma testified that she subjectively believed that plasma sales were not taxable. *Id.* at 99. But the district court did not permit expert testimony that a recognized legal theory supported her belief. *Id.* Under those circumstances, our court held that the district court improperly "deprived the defendant of evidence showing her state of mind to be reasonable." *Id.* Setting aside the minimal probative value of Skora's testimony compared to the tax expert's testimony in *Garber*, here, the district court permitted cross-examination on what the defense argued was an exculpatory fact: the creation and vetting of the contracts by outside lawyers. If the *Garber* defendant had been permitted to cross-examine a phlebotomist at the plasma center about how the technician had vetted a tax-free pay-for-plasma deal with a lawyer, the court very well may have decided the case differently. Given Kimble's cross-examination and nature of Skora's testimony, the district court did not withhold a fact that had a "powerful impact on the issue of [the Hagens'] willfulness . . . from the jury," *see id.*

refused reimbursement.  The jury also heard evidence that the Hagens and Kimble used a contrived formula to make invoices conform with their contracts and adopted a standard price per brace.  The Hagens' employees testified that they were not allowed to interact with Kimble's companies, the Hagens' business exploded as soon as they started working with Kimble, and the Hagens' claims were frequently rejected by Medicare and private insurers.  If that were not enough, Kimble's brother testified that he had a similar kickback deal with Kimble.  Given the strength of this evidence showing that the Hagens willingly participated in the kickback scheme—a scheme that was not disclosed to Skora—testimony that Kimble's operations seemed legitimate to Skora would not have impacted the verdict.

Ultimately, the jury did hear evidence that lawyers created the Hagens' contracts, a point which the defense argued to the jury in closing. Faced with this argument and the evidence supporting it, the jury rejected the defense theory that the Hagens thought Kimble's business was legitimate.  Skora's testimony that Kimble's operations, including the template contracts, seemed legitimate was too attenuated from the Hagens' deal and too repetitive of evidence the jury already heard to make a difference.  *See United States v. Mejia*, 844 F.2d 209, 215 (5th Cir. 1988) (exclusion of testimony harmless where cumulative); *United States v. Rajwani*, 476 F.3d 243, 248 (5th Cir. 2007) (exclusion of testimony harmless where cumulative and other evidence of guilty knowledge was extensive).

## III.

Next, the Hagens argue that the district court abused its discretion in refusing to give the jury a proposed instruction concerning a safe-harbor defense to the AKS violations.  But the Hagens did not put forward sufficient evidence to warrant such an instruction, and any error in refusing to give the instruction was harmless.

No. 21-11273
c/w No. 21- 11279

A.

We review a district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Martinez*, 921 F.3d 452, 477 (5th Cir. 2019); *see United States v. Gibson*, 875 F.3d 179, 195 (5th Cir. 2017). "The district court abuses its discretion by refusing to include a requested instruction only if that instruction: (1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005).

A defendant is generally entitled "to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see United States v. Bradfield*, 113 F.3d 515, 522 (5th Cir. 1997) (reiterating the standard from *Mathews* "that evidence in support of a defensive theory must be sufficient for a reasonable jury to rule in favor of the defendant on that theory"). It follows that a district court may refuse "to give a requested instruction which . . . is without foundation in the evidence." *United States v. Tannehill*, 49 F.3d 1049, 1057 (5th Cir. 1995) (citation omitted).

A trial court's failure to give a requested safe-harbor instruction "is subject to harmless error review." *United States v. Turner*, 561 F. App'x 312, 319 (5th Cir. 2014) (unpublished) (quoting *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014)); *see United States v. Nguyen*, 493 F.3d 613, 623 (5th Cir. 2007); *see also United States v. Chen*, 913 F.2d 183, 192 (5th Cir. 1990); *United States v. Bernal*, 814 F.2d 175, 184 (5th Cir. 1987). Even if the jury instructions were erroneous on account of an improperly omitted instruction, "we will not reverse if we determine, based on the entire record,

20

No. 21-11273
c/w No. 21- 11279

that the challenged instruction could not have affected the outcome of the case." *Nguyen*, 493 F.3d at 623 (citation omitted).

B.

As we explained, the AKS is violated when a defendant knowingly and willfully gives or receives "remuneration" for referring a party to a health care provider for services paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(1), (b)(2); *see Sanjar*, 876 F.3d at 746. The Department of Health and Human Services ("DHHS") has promulgated regulations that exclude certain types of remuneration from criminal liability under the statute. *See* 42 C.F.R. § 1001.952(b), (d), (f). Relevant here, these "safe-harbor" provisions include an exception for "personal services" contracts where "payment [is] made by a principal to an agent as compensation for the services of the agent" and certain conditions are met.[6] *Id.* § 1001.952(d).

For the personal services safe harbor to apply:

(1) the agreement must be "set out in writing and signed by the parties";

---

[6] Between January 20, 2016, and January 18, 2021, the personal services safe harbor remained the same and its conditions were codified at 42 C.F.R. § 1001.952(d)(1)-(7). In 2021, DHHS amended the applicable conditions for application of the personal services safe harbor and recodified the amended conditions at 42 C.F.R. § 1001.952(d)(1)(i)-(vi). *See* 85 Fed. Reg. 77,887 (Dec. 2, 2020). The parties do not take positions on whether the old or new safe-harbor regulations apply in this case. While the government appears to cite the 2021 amendments, the defendants' proposed instruction, filed with the trial court on July 5, 2021, more closely tracks the language of the pre-2021 regulations. This opinion applies the pre-2021 regulations that were in effect when the Hagens entered and performed the contracts at issue. In any event, whether we apply the new or old regulations does not affect the disposition of this issue.

(2) the agreement must "cover[] all of the services the agent provides to the principal for the term of the agreement and specif[y] the services to be provided by the agent";

(3) if the agreement provides for services on less than a full-time basis, the agreement must specify "exactly the schedule of such intervals, their precise length, and the exact charge for such intervals";

(4) the agreement's term "is for not less than one year";

(5) "[t]he aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs";

(6) services performed under the agreement do not involve counseling or promoting an activity that violates state or federal law; and

(7) "[t]he aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services."

42 C.F.R. § 1001.952(d)(1)-(7) (2016).

The parties agree that the safe-harbor provision is an affirmative defense. *See United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished) (per curiam); *United States v. Turner*, 561 F. App'x 312, 319 (5th Cir. 2014) (unpublished); *see also Sanjar*, 876 F.3d at 742.

At the charge conference, the Hagens maintained their initial request for an instruction on the personal services safe harbor, as well as for a

preliminary instruction explaining that the defendant would have to prove the safe-harbor affirmative defense by a preponderance of the evidence. The government objected that the Hagens had not put forward sufficient evidence that the agreements covered all services to the agent and specified those services, 42 C.F.R. § 1001.952(d)(2), did not take into account the volume or value of referrals, 42 C.F.R. § 1001.952(d)(5), and were not consistent with fair market value, 42 C.F.R. § 1001.952(d)(5). After hearing argument, the district court did not give the requested personal services safe-harbor instruction. However, the district court did give an instruction on a good faith defense, as the Hagens requested.

## C.

The Hagens did not present sufficient evidence on the fifth element of the personal services safe-harbor instruction for a reasonable jury to find in their favor on the defense. *Mathews*, 485 U.S. at 63; *see Bradfield*, 113 F.3d at 522. The district court accordingly did not abuse its discretion in declining to give a safe-harbor instruction. *See Tannehill*, 49 F.3d at 1057; *United States v. Vega*, 813 F.3d 386, 397 (1st Cir. 2016); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (unpublished) (per curiam).

On appeal, the Hagens argue that the personal services safe harbor applied to the BPO contracts and do not argue that the defense covered the marketing services contracts. But the evidence did not show that either contract was "consistent with fair market value in arms-length transactions" or was "not determined in a manner that takes into account the volume or value of any referrals" in accordance with the safe-harbor provision's fifth element. 42 C.F.R. § 1001.952(d)(5).

To begin, the record is devoid of evidence that the marketing or BPO agreements paid "aggregate compensation" to Kimble that was "consistent with fair market value in arms-length transactions." 42 C.F.R.

§ 1001.952(d)(5).  The marketing contracts refer to price terms set in a "Campaign Insertion Order," and it appears that the Hagens were invoiced $7.50 per raw lead.  The BPO contracts set a rate of $8 per hour.  On appeal, the Hagens do not point to any evidence that those rates satisfied the fair market value standard set in the safe-harbor provision.  Our inquiry could stop here—the Hagens failed to introduce sufficient evidence for a jury to find all the requirements for the safe-harbor defense.  *See Tannehill*, 49 F.3d at 1057.

The contracts also accounted for the volume of referrals.  42 C.F.R. § 1001.952(d)(5).  The Hagens agree that the marketing contracts pegged compensation on the number of raw leads generated, which they admit disqualifies those contracts from the safe harbor.  But they argue that the BPO contracts charged $8 per hour for BPO services irrespective of raw leads.

Whatever the BPO contracts said on their face, the Hagens acknowledge in their reply that "the money they remitted for BPO services was connected to the number of 'raw leads.'"  And that concession is consistent with their own theory of how the contract worked in practice.  The Hagens testified that they prepaid for marketing and BPO services, that the amounts they prepaid were divided on a fixed basis, 75 percent for marketing and 25 percent for BPO, and that the total amount invoiced was based on a target number of raw leads.  So it stands to reason that the amount paid pursuant to the BPO contract took into account the volume of raw leads— after all, the prepaid BPO services fee was calculated as a function of the raw leads that the Hagens wanted to procure.  And just because those raw leads weren't guaranteed, or so the Hagens testified, does not mean that the BPO fee was determined without reference to referral volume, as the safe-harbor provision requires.  *See* 42 C.F.R. § 1001.952(d)(5).

Under the Hagens' own understanding of the BPO contract, hourly compensation was determined in a manner that accounted for the volume of referrals.  If the Hagens were right that a defendant could omit from a contract the real way the parties calculated an hourly fee—which is to say, by deciding in advance how many referrals would be generated and then charging the hourly fee necessary to get those referrals—the safe-harbor provision would shield pretextual agreements from criminal liability.  But how a contractual rate is implemented is relevant in determining whether the rate is set by referral volume.  *See United States v. Nagelvoort*, 856 F.3d 1117, 1125-26 (7th Cir. 2017) (affirming jury verdict on sufficiency of the evidence challenge where recorded conversations revealed that a putative hourly rate might have been based on referrals).  Here, the defendants' own testimony as to how the BPO contract worked puts the contract outside the protection of the safe harbor.  In light of this testimony, a reasonable jury could not have found that the BPO contract was referral-agnostic, and so the district court did not abuse its discretion in declining the instruction on this basis, either.

Moreover, any error by the district court in declining to give a safe-harbor instruction for the BPO contracts was harmless because, taken by itself, the proposed personal services safe-harbor instruction as to the BPO contracts could not have impacted the jury's verdict.

Although the Hagens argued that the BPO and marketing services contracts were both covered by the safe harbor at trial, on appeal, they drop their challenge to the omitted instruction as to the marketing services contracts.  That leaves the instruction for the BPO contracts.  Assuming the district court erred in declining the safe-harbor instruction with respect to the BPO contracts, the jury may have found the personal services safe harbor applied to those contracts.  If the jury did reach that conclusion, the Hagens'

payment practices under those contracts would not give rise to criminal AKS violations. *See* 42 C.F.R. § 1001.952.

However, by accepting that the district court properly withheld the safe-harbor instruction as to the marketing contracts, the Hagens concede that the jury could have convicted them for their payment practices under those contracts. Indeed, the Hagens state that had the jury found the BPO contracts subject to the safe harbor, then the jury would "have focused on the Hagens' intent with respect to the marketing agreement." And given the evidence the jury heard about how the Hagens covered up their purchase of doctors' orders, a reasonable jury could have convicted the Hagens of taking kickbacks anyway. Put differently, because of the structure of the kickback scheme in which the Hagens paid for doctors' orders under the guise of the marketing and BPO services contracts, the Hagens needed safe-harbor instructions on both contracts to have hoped for acquittal.

## IV.

The Hagens attack their sentences on the ground that the district court clearly erred in imposing a two-level sentencing enhancement for sophisticated money laundering. This challenge is meritless.

## A.

We review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual determinations for clear error. *United States v. Charon*, 442 F.3d 881, 887 (5th Cir. 2006). Here, the parties agree that we review a district court's finding of a sophisticated money laundering enhancement for clear error. *See id.* at 890. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we will not reverse under the clear error standard even if we "would have weighed the evidence differently" had we been the factfinder.

*Id.* at 890-91.  Reversal is appropriate only if we are "left with the definite and firm conviction that a mistake has been committed."  *Id.* at 891.

## B.

Section 2S1.1(b)(3) of the Sentencing Guidelines imposes a two-level sentencing enhancement where the defendant was convicted under 18 U.S.C. § 1956 and "the offense involved sophisticated laundering."  U.S.S.G. § 2S1.1(b)(3).   The commentary defines "sophisticated laundering" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense," and explains that "[s]ophisticated laundering typically involves the use of" (i) "fictitious entities," (ii) "shell corporations," (iii) "two or more levels" or "layering" "of transactions . . . involving criminally derived funds that were intended to appear legitimate," or (iv) "offshore financial accounts."  *Id.* § 2S1.1 cmt. n.5(A).  Those factors are not exclusive.  *See United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013); *United States v. Ada*, 700 F. App'x 689, 690 (9th Cir. 2017) (unpublished).  But when the offense conduct includes one or more of those four factors, "the commentary clearly subjects an individual to the sophisticated laundering enhancement."  *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2006).

Application Note 5(B) to Section 2S1.1 instructs courts *not* to apply the sophisticated laundering enhancement where "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of [the sophisticated laundering enhancement]."  U.S.S.G. § 2S1.1 cmt. n.5(B).

The amended pre-sentence reports ("PSR") for the Hagens calculated their base offense level as 8.  Probation recommended a 20-level increase based on the amount of the improper benefit conferred less the direct costs of braces, or $24,620,325.63.  *See* U.S.S.G. §§ 2B4.1(b)(1),

2B1.1(K).  Pursuant to § 2S1.1(b)(2)(B), the PSRs imposed a two-level increase because the Hagens were convicted under 18 U.S.C. § 1956.  Finally, the PSRs applied a two-level enhancement for sophisticated laundering because the Hagens "sent unlawfully derived gains from Medicare fraud to Kimble's bank account in the Philippines" to "promote and continue the Medicare fraud," and "sent unlawfully derived gains . . . to their personal bank accounts in Spain and Austria" to build a second home.  Based on a total offense level of 32 and a category I criminal history, the PSRs calculated the guidelines range as 121 to 151 months' imprisonment.

At sentencing, the Hagens objected to the sophisticated laundering enhancement.  The Hagens argued that their laundering activity consisted of "open and transparent wire payments" without an "attempt to conceal or divert" the activity.  In addition, the Hagens claimed that the enhancement "essentially underlines the . . . conviction related to money laundering [and] unfairly penalizes [them]" because the overseas transfers were not used to conceal the funds.  The Hagens also pointed to Application Note 5(B)'s direction not to apply the enhancement where "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of [the sophisticated laundering enhancement]."  *Id.* § 2S1.1 cmt. n.5(B).  They argued that because their conviction for conspiracy to commit money laundering was predicated on transferring money overseas, *see* 18 U.S.C. § 1956(a)(2)(A), the conduct that formed the basis for the sophisticated laundering enhancement was the same conduct as the underlying offense.

The government responded that the Hagens made payments to offshore accounts that were "sent in two parts" and "reverse engineered based on the sham invoices . . . to conceal the nature of the payments."  The

government also emphasized that the Hagens prepaid the wires "to further conceal the nature of the payments."

After hearing argument, the district court overruled the Hagens' objection and applied the two-level enhancement for sophisticated laundering.

## C.

The district court did not err in imposing the sophisticated laundering enhancement since the Hagens manipulated their wire transfer payments to conceal the kickback scheme. And because the Hagens' conduct with respect to the marketing and BPO services invoices did not form the basis of another enhancement under the Guidelines, Application Note 5(B) does not foreclose a sophisticated laundering enhancement.

In applying the sophisticated laundering enhancement, the district court did not commit a definite mistake. *See Charon*, 442 F.3d at 887. The district court took a plausible view of the evidence in concluding that the Hagens' offense conduct pertaining "to the execution or concealment" of the laundering crime was sufficiently "complex or intricate." U.S.S.G. § 2S1.1 cmt. n.5(A). Here, the underlying offense was conspiracy to transmit money from the United States to a place outside the United States to promote unlawful activity. *See* 18 U.S.C. § 1956(a)(2)(A). The Hagens' efforts to disguise their purchase of illegal kickbacks by structuring their payments as multiple prepaid invoices for legitimate services meets the standard for complex or intricate conduct. On a weekly basis, the Hagens wired two sets of funds to Kimble's companies in the Philippines as prepayment for marketing and BPO services invoices. Those invoices appeared legitimate. But the sum of the invoices equaled the total charge for a set number of doctors' orders. Kimble calculated the net price for the doctors' orders and then charged the Hagens in two separate invoices by

No. 21-11273
c/w No. 21- 11279

dividing the total between marketing and BPO services.  As a result, the dual wire transfers disguised the illegal sale of doctors' orders.

In sum, the Hagens' (i) division of illegal kickbacks into two invoices, (ii) mislabeling of those divided invoices as relating to legitimate services, and (iii) prepayment of those mislabeled invoices to further conceal the kickbacks are sufficiently "complex or intricate" to warrant the sophisticated laundering enhancement.  U.S.S.G. § 2S1.1 cmt. n.5(A); *cf. United States v. Chon*, 713 F.3d 812, 822-23 (5th Cir. 2013) ("Maintaining two sets of books, skimming income on a daily basis, and disguising . . . proceeds  . . . to make the criminally derived funds appear legitimate are sufficiently complex to support the enhancement.").[7]

Relying on Application Note 5(B), the Hagens argue first, that the district court clearly erred in applying the sophisticated laundering enhancement even though some of the conduct supporting the enhancement was conduct charged in the underlying offense, and second, that sophisticated laundering enhancement was improperly based on the same

---

[7] The cases upon which the Hagens rely do not involve the § 2S1.1(b)(3) enhancement.  *United States v. Valdez*, 726 F.3d 684, 695 (5th Cir. 2013) (§ 2B1.1(b)(9)(C)); *United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008) (same); *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996) (§ 2T1.1(b)(2)); *United States v. Charroux*, 3 F.3d 827, 837 (5th Cir. 1993) (same).  Even assuming any of those cases are persuasive in the context of § 2S1.1(b)(3), all except *United States v. Valdez* affirmed the district court's finding of sophisticated means and did not set a factual floor for such a finding.  And in *Valdez*, we reversed because the defendant "used no false names, fictitious entities, shell companies or complicated financial transactions, or any other particularly sophisticated means to hide or conceal the assets."  726 F.3d at 695. Specifically, the defendant "took money directly deposited from Medicare into his operating account, which was in his name, and moved it into his investment accounts, which were also in his name." *Id.*  The Hagens went far beyond *Valdez* in reverse-engineering mislabeled invoices to disguise their illegal activity.

conduct giving rise to the twenty-level improper benefit enhancement. Neither argument is a reason to reverse the district court.

The Hagens' first argument misapprehends the plain language of Application Note 5(B). This comment directs the district court to not apply the sophisticated laundering enhancement if "the conduct that forms the basis *for an enhancement under the guideline applicable to the underlying offense* is the only conduct that forms the basis for application of [the sophisticated laundering enhancement]." U.S.S.G. § 2S1.1 cmt. n.5(B) (emphasis added). The relevant question is whether the only conduct supporting the sophisticated laundering enhancement also forms the basis for a different *enhancement* for the underlying offense, not whether the only conduct supporting the sophisticated laundering enhancement is the conduct charged in the underlying offense.

Because 18 U.S.C. § 1956(a)(2)(A) criminalizes "transport[ing], transmit[ting], or transfer[ring]" money from a place "in the United States" to "a place outside the United States," many if not all § 1956(a)(2)(A) charges will involve the use of offshore accounts. At least some § 1956(a)(2)(A) convictions—those that involve offshore accounts as opposed to sacks of money being shipped to a stash house, for example—will almost always warrant a sophisticated laundering enhancement. *See* U.S.S.G. § 2S1.1 cmt. n.5(A)(iv). The Sentencing Guidelines contemplate this result. Section 2S1.1 predicates the sophisticated laundering enhancement on a violation of 18 U.S.C. § 1956 and includes offshore accounts as a defined example of qualifying conduct. *Cf. United States v. Reyes*, 781 F. App'x 965, 969 (11th Cir. 2019) (unpublished) (per curiam) (Application Note 5(B) "is designed to prevent a defendant from receiving the same enhancement both for the underlying offense and for the sophisticated laundering."); *United States v. Mehmood*, 742 F. App'x 928,

943 (6th Cir. 2018) (unpublished) (analyzing double counting of enhancements, not underlying charged offense); *United States v. Rubashkin*, 718 F. Supp. 2d 953, 977 n.14 (N.D. Iowa 2010) (same).

But even setting aside the offshore accounts, the district court was justified in applying the enhancement because the Hagens bifurcated, mislabeled, and prepaid the invoices.[8]

The Hagens' second argument, that the same conduct gives rise to the sophisticated laundering and improper benefit enhancements, is also incorrect. In addition to the sophisticated laundering enhancement, the district court applied a twenty-level enhancement based on "the value of the . . . improper benefit." U.S.S.G. § 2B4.1(b)(1). But as the government notes, the improper benefit enhancement was based on the volume of the fraud, while the sophisticated laundering enhancement was based on the manner in which the fraud was executed. In other words, the sophisticated laundering enhancement was triggered by the Hagens' conduct executing and concealing the fraud—not the dollar amount of the Hagens' profit from the Medicare fraud. *Cf. United States v. Small*, 210 F. App'x 776, 783 (10th Cir. 2006) (unpublished) (rejecting double counting challenge to application of sophisticated means enhancement with amount of loss enhancement because "the method by which the money was obtained or concealed is irrelevant" to enhancements "concerned solely with amounts of money").

The Hagens insist that the amount of the fraud and the manner of the fraud is conduct all the way down. They reason that the conduct giving rise to the improper benefit, wire transfers, is the same conduct that counts as

---

[8] The Hagens argue that prepayment formed the basis of the underlying conviction, too. They do not explain why this is true. But accepting the argument, the division and mislabeling of the invoices were still enough for the district court to apply the enhancement, and the Hagens do not appear to argue that those actions were charged under § 1956.

sophisticated laundering. Their theory defies the plain language of the Sentencing Guidelines, which direct a court to look only at the value of an improper benefit in § 2B4.1(b)(1) and only at the nature of laundering activity in § 2S1.1 cmt. n.5(A). And if their theory were true, a court could almost never apply the improper benefit and sophisticated laundering enhancements at the same time, because the sophisticated laundering conduct would probably have been related to the accumulation of the improper benefit.

For those reasons, the sophisticated laundering enhancement is affirmed.

V.

Finally, the Hagens argue that the district court's restitution order pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, is unlawful. The Hagens contend that the crimes for which they were convicted, conspiracy to defraud the United States and to pay and receive kickbacks and conspiracy to commit money laundering, are not "offense[s] against property [under Title 18], . . . including any offense committed by fraud or deceit" within the meaning of the MVRA. *See id.* § 3663A(c)(1)(A)(ii). Specifically, the Hagens maintain that this provision, § 3663A(c)(1)(A)(ii), should be interpreted according to a "categorical approach." Rather than look at how a crime was committed in deciding whether the crime counts as an "offense against property . . . committed by fraud or deceit," courts applying the categorical approach would consider the elements of the offense. Applying the categorical approach, the Hagens conclude that because their crimes of conviction do not contain the elements of a crime against property by fraud or deceit, the restitution order was not authorized by the statute.

Three of our sister circuits have rejected application of the categorical approach to § 3663A(c)(1)(A)(ii). *See United States v. Razzouk*, 984 F.3d 181,

187-89 (2d Cir. 2020); *United States v. Ritchie*, 858 F.3d 201, 208-10 (4th Cir. 2017); *United States v. Collins*, 854 F.3d 1324, 1333-35 (11th Cir. 2011). The Hagens give us no reason to depart from those well-reasoned opinions. Today, we join those circuits in holding that the categorical approach does not control the analysis of whether a Title 18 offense is "against property" for purposes of the MVRA. Instead, the factual circumstances of the crime of conviction determine whether the crime is an "offense against property" requiring mandatory restitution.

## A.

The parties dispute whether our review of an illegal restitution order is de novo or for plain error where, as here, the defendants failed to preserve their challenge.

Our cases are split on what standard of review applies to an unpreserved challenge against the legality of a restitution order. Usually, when a party fails to preserve a legal argument, our review is for plain error. *See, e.g.*, *United States v. Leal*, 933 F.3d 426, 431 (5th Cir. 2019). And in some cases, we have taken a plain-error approach with respect to attacks on the legality of restitution orders. *See id.*; *United States v. Rosbottom*, 763 F.3d 408, 419 (5th Cir. 2014). But more recently, we have reviewed "de novo the legality of a restitution order, regardless of whether the defendant raised this objection at sentencing," "[b]ecause a restitution order that exceeds the court's statutory authority is an illegal sentence . . . [that] always constitutes plain error." *United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2526 (2021); *United States v. Nolen*, 472 F.3d 362, 382 (5th Cir. 2014) (same).

Here, we need not decide whether de novo or plain-error review applies because the result is the same under either standard.

B.

The MVRA imposes mandatory restitution if a defendant commits "an offense against property . . . including any offense committed by fraud or deceit" and "an identifiable victim . . . suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B); *see United States v. Tarnawa*, 26 F.4th 720, 723 (5th Cir. 2022). When the district court finds those conditions satisfied, it must "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A)); *see Tarnawa*, 26 F.4th at 723.

The Hagens argue that in determining whether a crime of conviction is an "offense against property . . . committed by fraud or deceit," courts must use a categorical approach and focus on the elements of the offense rather than facts about how it was committed. The Hagens borrow the concept of a categorical approach from the interpretation of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). As relevant here, ACCA imposes a sentencing enhancement for certain firearms offenses where the defendant had been previously convicted of three violent felonies, including burglary. *See id.* In determining whether a prior offense counted as burglary and triggered the ACCA enhancement, the Supreme Court in *Taylor v. United States* held that sentencing courts "must look only to the statutory definitions of prior offenses . . . and not to the particular facts underlying those convictions." 495 U.S. 575, 600 (1990). Along similar lines, the Hagens imagine a categorical approach to the MVRA that would consider whether the crime of conviction has the elements of an "offense against property," including such an offense "committed by fraud or deceit."

No. 21-11273
c/w No. 21- 11279

The Hagens are wrong. The text, structure, and purpose of the MVRA permit a sentencing court to consider the factual circumstances in which an offense was committed in deciding whether the offense was against property.

Start with the text. Section 3663A(c)(1)(A)(ii) says that a Title 18 "offense against property" includes "any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The statute says that the way the offense is "committed" may bring it within the meaning of the offense-against-property provision. *See Razzouk*, 984 F.3d at 187. Indeed, it was significant in *Taylor* that ACCA referred to a person who "has three previous *convictions*" for violent felonies, not "a person who has *committed*" violent felonies. 495 U.S. at 600 (emphasis added). The absence of "committed" from ACCA supported "the inference that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.* The presence of "committed" in the offense-against-property provision leads to the opposite conclusion: facts matter here.

Section 3663A(c)(1)(A)(ii) also lacks any affirmative textual clues that Congress meant courts to consider the elements of property offenses. No language in § 3663A(c)(1)(A)(ii) directs courts to the elements of Title 18 statutory offenses. Nor does the statute include a representative list of property offenses that refer to generic crimes. *Ritchie*, 858 F.3d at 210.

Elsewhere in the MVRA, Congress did call for a categorical approach. In the preceding subsection, § 3663A(c)(1)(A)(i), Congress designated "a crime of violence, as defined in section 16" of Title 18 as triggering mandatory restitution. And the language of § 16 "unmistakably uses an 'elements' formulation, defining a 'crime of violence' as one that has as 'an element the use, attempted use, or threatened use of physical force against

No. 21-11273
c/w No. 21- 11279

the person or property of another.'" *Razzouk*, 984 F.3d at 187 (quoting 18 U.S.C. § 16). Accordingly, under § 16, courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004).[9] Congress could have made a similar choice in § 3663A(c)(1)(A)(ii) but did not. The difference "shows that Congress intended subsection (c)(1)(A)(ii) to cover a broader range of prior offenses than those reached by subsection (c)(1)(A)(i)." *Ritchie*, 858 F.3d at 210 (cleaned up).

Finally, a fact-based approach is consonant with the remedial purpose of the MVRA. The primary goal of the MVRA is "to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due." S. Rep. No. 104-179, at 12–13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 925–27. Congress intended the MVRA to "expand the number of identifiable victims entitled to full, mandatory restitution," but the categorical approach would illogically exclude "those unfortunate victims who suffer property loss as a result of an offense that doesn't contain as an element a reference to 'property.'" *Ritchie*, 858 F.3d at 210.

The Hagens do not launch a coherent attack on the district court's restitution order under a fact-based approach. Any such challenge would be futile. The trial court heard sufficient evidence to find that the Hagens used fraud to derive an unlawful benefit in the amount of $27,104,359 from the Medicare program. This is enough to establish an "offense against property . . . committed by fraud or deceit" under the MVRA. 18 U.S.C. §

---

[9] The Hagens argue in reply that because *Leocal* was decided after enactment of the MVRA, Congress could not have been aware that the § 3663A(c)(1)(A)(i) inquiry would necessarily involve a categorical analysis of violent crimes. But as we explained, the language of § 16 is clear and shows that Congress could have used the "elements" formula in § 3663A(c)(1)(A)(ii) but did not. *See Razzouk*, 984 F.3d at 187.

No. 21-11273
c/w No. 21- 11279

3663A(c)(1)(A)(ii); *see Collins*, 854 F.3d at 1331 (offenses against property "includes situations where the defendant seeks to derive an unlawful benefit from another's property or otherwise deprive a person of his property").

## VI.

For those reasons, the Hagens' convictions and sentences are AFFIRMED.